ATARI CORPORATION, a Nevada
corporation, Plaintiff–
Appellant,

v.

ERNST & WHINNEY, a partnership;
Goldman Sachs, a partnership; Wilfred
Schwartz, Keith Powell; Merrill Lyons;
Michael A. Pastore; Hyman Hershow;
Marc Laulhere; Jack W. Minor, indi-
viduals, Defendants–Appellees.

ATARI CORPORATION, a Nevada
corporation, Plaintiff–
Appellee,

v.

ERNST & WHINNEY, a partnership;
Goldman Sachs, a partnership,
Defendants,

and

Wilfred Schwartz, Keith Powell; Merrill
Lyons; Michael A. Pastore; Hyman
Hershow; Marc Laulhere; Jack W. Mi-
nor, individuals, Defendants–Appel-
lants.

Nos. 91–15668, 91–15693.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1992.

Decided July 22, 1992.

As Amended on Grant of Rehearing
Dec. 10, 1992.

Jonathan P. Hayden, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Matthew S. Steinberg, Inman, Weisz & Steinberg, Beverly Hills, CA, and Robert A. Sacks, Sullivan & Cromwell, Los Angeles, CA, for appellees-appellants.

John W. Clark, Clark & Korda, San Jose, CA, for appellant-appellee.

Before: ALARCON, HALL, and KLEINFELD, Circuit Judges.

## ORDER

Appellant Atari's petition for rehearing is GRANTED. The opinion filed July 22, 1992, is amended as follows: [Editor's Note: These amendments have been incorporated into the published opinion.]

Appellant Atari's motion to correct the record to include the transcript of the pretrial conference is GRANTED.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Atari Corporation ("Atari") appeals the district court's order granting summary judgment to Appellees Ernst & Whinney, Goldman Sachs, and several officers ("the individual defendants") of the Federated Group, Inc. ("Federated") on Atari's claims of securities fraud under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b–5 thereunder, related RICO violations, common law fraud, negligent misrepresentation, and professional malpractice, arising out of a merger agreement between Atari and Federated. The district court had federal question jurisdiction over Atari's federal law claims pursuant to 28 U.S.C. § 1331, and pendent jurisdiction over Atari's state claims. We have jurisdiction over this timely filed appeal pursuant to 28 U.S.C. § 1291 and we affirm.

The individual defendants appeal the district court's order denying their counterclaim for indemnification, which they base on a provision in the Agreement and Plan of Merger ("the Agreement") between Federated and Atari. The district court had ancillary jurisdiction over the individual defendants' compulsory counterclaim. *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974). We have jurisdiction under 28 U.S.C. § 1291 and we reverse.

## I

### FACTS

On April 26, 1987, Atari initiated a plan to acquire Federated. Atari's evaluation of Federated's finances began in earnest on June 30 when Greg Pratt, Atari's chief financial officer, attended a meeting at which he received audited 10–K forms filed by Federated with the SEC for the fiscal years ending March 1, 1986 and 1987, and Pratt also received an unaudited May 31, 1987 10–Q form. Because the 10–K statements had been audited, Pratt assumed the numbers he had before him were basically accurate. He nevertheless retained a healthy skepticism. "I discounted those statements somewhat, simply because I knew Federated was losing money and I assumed that they would take a slightly aggressive stance on accounting issues." Pratt also knew that $2.4 million of goodwill assigned to one Federated store would have to be written off entirely.

In addition to the SEC forms, Pratt reviewed a May 22, 1987 loan agreement between Federated and its banks, Federated's general ledger, and an inventory report. In the course of discussing these items, Federated's chief financial officer Merrill Lyons assured Pratt regarding several problems raised in the Ernst & Whinney audit and told him that information regarding "D" Code (distressed, discontinued, old) inventory was not available. Despite these assurances, Pratt was left with the impression that the value of the company's assets had been "grossly overstated." As discovery proceeded, the picture of Federated's financial condition grew bleaker. Pratt testified that "the longer we investigated, the more dirt we found."

In early August, Pratt asked Earl Charles of Deloitte Haskins & Sells to review Ernst & Whinney's work papers for the fiscal year end March 1, 1987. Charles's review revealed one significant flaw in the audit. Federated's financial statements listed as an asset $8 million in market development funds ("MDF"), which are funds manufacturers make available to retailers to promote products. The Ernst & Whinney audit had not reviewed this asset and Pratt felt the MDF's should not be listed because they had not been collected. In a telephone conversation that took place sometime between August 10 and August 14, Pratt asked Lyons to provide a list of the vendors who owed Federated these MDF's, so he could verify the asset, but Lyons refused.

During this same conversation, Pratt and Lyons discussed several other problems that Pratt perceived in the financial state-

ments, among which was the way Federated had depreciated its prerecorded video tape inventory. Pratt asked Lyons for certain information that would enable him to analyze whether Federated's depreciation method was appropriate. He did not receive that information prior to August 23, the date the Agreement was entered.

Two investment bankers from Goldman Sachs took part in this conversation and assured Pratt that the numbers in Federated's financial statements were valid. But Pratt proceeded with his own evaluation, in an effort to estimate the "true" net book value of the company. His analysis led him to conclude that Federated's value should be adjusted downward by $11.6 million. Pratt developed this estimate using Federated's depreciation of the videotape inventory, which he did not trust. Thus from his perspective, the $11.6 million figure was a conservative estimate of the extent to which Federated had been overvalued. When Pratt informed Goldman Sachs about his own valuation of the company, the investment bankers once again insisted that Federated's numbers were accurate and that his adjustments were inappropriate. Pratt remained unconvinced, and up until August 23 he continued to believe that adjustments of between $10 and 15 million were necessary.

By August 23 Pratt had concluded that Federated's balance sheet required between $14 and $20 million in adjustments— a conclusion based in part on a determination that the $8 million MDF account was "bogus." But he realized that a writedown of these assets would trigger the default provisions of Federated's loan agreements with several banks.

Despite Pratt's concerns, Atari and Federated entered into the Agreement and Plan of Merger on August 23. Atari offered to purchase all the shares of Federated stock at a price of $6.25 per share. Although this price was less than that requested by Federated, Pratt believed it was still about $2.15 too high. The deal was made contingent on further due diligence revealing no significant problems with Federated's financial statements.

Due diligence conducted subsequent to August 23 led Atari to conclude that Federated's books had to be adjusted downward by about $30 million. These adjustments, Pratt realized, would place Federated in "instant default" under its loan agreements. By September 27, Pratt had determined that Federated's 10–K and 10–Q reports contained untrue statements and that Atari had been fraudulently induced to enter the Agreement. On that day, Atari sent a letter to Federated's chairman, Wilfred Schwartz, indicating Atari's intention to withdraw from the deal unless Federated permitted Atari to extend its tender offer 45 days so it could audit Federated's books. Federated rejected the proposal and insisted that Atari had an obligation to close the deal. If it did not, Federated would almost surely go into bankruptcy and sue Atari for damages.

At this point, Schwartz proposed the deal that the parties refer to as the "Bet Agreement." The agreement provided for a post-closing audit. If the audit revealed the need for adjustments between $27 and $32 million, Atari would be locked into the $67 million purchase price. But if the audit revealed the need for adjustments greater than $32 million, Schwartz would have to pay Atari one dollar for each dollar in adjustments, up to $37 million. If the adjustments turned out to be less than $27 million, Atari would cancel Schwartz's guarantee to Federated's lenders by one dollar per dollar of adjustments, up to $5 million. In other words, Atari was betting that up to $5 million in additional adjustments would be necessary; if they were, the purchase price would be effectively reduced $5 million to $62 million. It appears that Atari predicted—accurately—that even greater adjustments would be necessary, for it proposed to eliminate the $5 million cap on Schwartz's liability. Schwartz, however, would not enter the bet without the cap.

Though Pratt believed Federated's assets were overstated, without an audit he could not be sure and he therefore felt that Atari had no choice but to proceed with the deal. On October 5, the deal was closed and, as it

expected, Atari won the bet. On February 15, 1988, the results of Coopers and Lybrand's audit were released identifying adjustments of $43 million dollars, resulting in a reduction of Federated's net worth by $33 million. Pratt claims that he never believed the adjustments would be as high as that, and if he had, he would not have agreed to going forward with the deal.

Upon the defendants' motions for summary judgment, the district court held discovery limited to the question of whether Atari justifiably relied on any allegedly fraudulent statements by any defendant. The court entered summary judgment in favor of all defendants on the ground that no triable issue of fact existed regarding justifiable reliance.

## II

## JUSTIFIABLE RELIANCE

### A

■ Initially, we must resolve a dispute regarding the point at which Atari's reasonable reliance should be measured. All the parties, including Atari, agree that reliance should be measured from the moment at which Atari was "committed" to purchase the Federated stock. But they disagree about when that moment was. It is, of course, a basic principle of the common law of contracts that when a party's duty to perform under a contract is conditioned on the happening of an event, the duty does not arise until the event occurs. *See* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.1, at 343 (1990); 1 B.E. Witkin, *Summary of California Law (Contracts)* § 721, at 654 (9th ed. 1987). The principle applies in federal securities law as well, so that a party is not committed to purchase securities while its obligation to perform under the purchase agreement remains conditional. *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 650–52 (9th Cir.1988), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).

■ It is quite evident from the terms of the Agreement that, prior to closing, Atari's obligation to purchase the Federat-

ed stock was conditional. Article X of the Merger Agreement is entitled "Conditions Precedent." Section 10.3 states:

*Conditions to Obligations of Parent and Purchaser to Effect the Merger.* The obligations of Parent and Purchaser to effect the Merger *shall be subject to the fulfillment at or prior to the Effective Date* [defined in section 2.3 as the date of closing] of the following additional conditions:

. . . .

(b) The representations and warranties of [Federated] contained in this Agreement or otherwise furnished in writing in connection herewith shall be true and correct in all material respects *on and as of the Effective Date as if made on and as of such date* ... except representations specifically limited to the date hereof or a specific date which were accurate in all material respects on such date.

(emphasis added).

Among the warranties and representations in the Agreement were: a statement that Federated's 10–K filings for the years ending March 2, 1986, and March 1, 1987, and its Form 10–Q for the period ending May 31, 1987, were materially accurate and fairly represented its financial condition (section 6.5); a statement that since May 31, 1987, there had been no "material adverse change" in Federated's financial condition, defined as a change greater than $2.5 million (section 6.6). By the time the merger agreement was signed, Atari believed Federated's 10–K and 10–Q filings overstated the value of Federated's assets by about $15 million. The due diligence that Atari conducted between August 23 and October 5 led it to the conclusion that Federated had been overvalued by about $30 million. The breach of the warranties contained in sections 6.5 and 6.6 constituted failures of conditions precedent to Atari's performance. Atari recognized this and threatened to call off the deal unless an accommodation could be reached. Because Atari was not committed to purchase the stock until the deal was closed on October 5, its knowledge and conduct up until that date are relevant to the reliance inquiry.

B

Without deciding whether Atari did in fact rely on the representations made by Appellees, we assume that it did and conclude that such reliance was unjustified under both federal securities and California law.

■ We need not resolve the parties' dispute over whether the proper standard for measuring reliance in a Rule 10b–5 action is "reasonableness" or "recklessness" in order to decide this case. The question the reliance analysis ultimately seeks to resolve is simply whether the alleged misrepresentations were a cause in fact of the plaintiff's injury. " 'Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm.' " *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985) (quoting *Zobrist v. Coal–X Inc.,* 708 F.2d 1511, 1517 (10th Cir.1983)).

■ There are essentially three circumstances in which courts impose this limitation; collectively, these circumstances define the justifiable reliance requirement. *See id.* at 529–30. One of these circumstances is the case of the investor who closes his eyes to a known risk. "If the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie. This is ... because the securities laws create liability only when there is 'substantial likelihood' that the misrepresentation 'significantly altered the total mix of information' that the investor possesses." *Id.* at 530 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)) (citations omitted). Atari's conduct is a paradigm of the case of the investor who closes his eyes to a known risk.

Despite mounting evidence that Federated's financial statements were grossly inaccurate, reflecting a ridiculous overvaluation of the company's assets, Atari continued to pursue the acquisition, closing the deal with the daredevil "Bet Agreement." By August 23, Atari had access to enough information to know that Federated had been overvalued by about $15 million, and that there was important information that Atari did not have that was likely to reveal the need for further adjustments. By September 27, Atari had been given access to the general ledger and the "D" Code inventory, and had done additional due diligence confirming its suspicions that further adjustments were necessary, to the tune of between $27 and 32 million, and that those adjustments would send Federated into default. The "Bet Agreement" demonstrates that by October 4, Atari fully expected that still more dirt would be uncovered. Under these circumstances, Atari's continued reliance on the financial statements and the assurances of Federated and its investment bankers cannot be justified. *See Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 965 (9th Cir.1990) (notice that financial statement overstated inventory figures made any further reliance on those figures unreasonable); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987) (reliance on representations that conflicted with evidence available to plaintiff was reckless).

C

■ For the same reasons, we conclude that Atari's conduct precludes it from holding Appellees liable under California law. As the district court explained, "justifiable reliance" is an essential element of each of Atari's common law claims. *See, e.g., Kruse v. Bank of America,* 202 Cal.App.3d 38, 248 Cal.Rptr. 217, 226 (1988) (fraudulent misrepresentation), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989); *Christiansen v. Roddy,* 186 Cal. App.3d 780, 231 Cal.Rptr. 72, 77 (1986) (negligent misrepresentation); *International Mortgage Co. v. John P. Butler Accountancy Corp.,* 177 Cal.App.3d 806, 223 Cal.Rptr. 218, 225–226 (1986) (professional malpractice). Whatever the standard for measuring justifiable reliance, it is plain that California law does not permit a

party to claim that it justifiably relied on representations that were obviously false.

In *Seeger v. Odell*, 18 Cal.2d 409, 414–415, 115 P.2d 977 (1941), the California Supreme Court set forth the law governing fraudulent misrepresentations that induce a person to enter a contract.

> If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable ... he will be denied a recovery. He may not put faith in representations which are preposterous, *or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth....*

*Id.* at 415, 115 P.2d 977 (emphasis added) (citations and internal quotations omitted).

Reasonable reliance, judged "in light of the plaintiff's intelligence and experience," remains the standard in fraudulent misrepresentation actions, and California courts do not, as Atari suggests, merely wink at this requirement, but rather take it quite seriously. *See Kruse*, 248 Cal.Rptr. at 226 (a plaintiff's "misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance"); *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 231 Cal.Rptr. 355, 358 (1986) (in fraud action, plaintiff must show justifiable reliance, "i.e. circumstances were such to make it *reasonable* for plaintiff to accept defendant's statements without an independent inquiry"). Atari does not satisfy this standard. As explained above, Atari possessed facts demonstrating that the representations upon which it claims to have relied were "patently and obviously false." Reliance on such statements is at the very least "manifestly unreasonable," and precludes a determination that the alleged misrepresentations caused Atari's injury. *See Seeger*, 18 Cal.2d at 415, 115 P.2d 977.

## III

## INDEMNIFICATION

■ We next turn to the individual defendants' counterclaim. The claim is based on section 9.3 of the Agreement, which provides for the indemnification of Federated's officers by Atari for expenses arising out of the merger. Following a trial, the district court ruled that section 9.3 did not provide for indemnification for expenses arising out of an action brought by Atari. It reasoned that, "[u]nder the ordinary and usual meaning of the word 'indemnify' as used in indemnity contracts, the indemnitor agrees to protect the indemnitee against claims of third parties alien to the contract." Because the parties to this agreement did not intend to attach any "special meaning" to the word "indemnify," section 9.3 only provided for indemnification for suits brought by third parties, not by Atari.

Section 9.3(b) of the Agreement states: "[Atari] will indemnify all present and former officers and directors of the Company to the fullest extent permitted by applicable law with respect to all acts and omissions arising out of such individuals' services as officers, directors or employees of the Company or any of its subsidiaries." In our view, this language unambiguously includes indemnification for expenses incurred defending lawsuits brought by Atari.

■ Agreements by corporations to indemnify corporate executives may well, as the district court concluded, typically contemplate stockholder derivative actions, claims by third parties, and securities and antitrust suits brought by the federal government. *See Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 566 n. 9, 442 P.2d 641, 646 n. 9 (1968); William Meade Fletcher, 13 *Fletcher Cyclopedia of the Law of Private Corporations* § 6045.1, at 521 (1991). But the district court was wrong to assume that the word "indemnify" necessarily carries with it the baggage of the clauses in which it most frequently appears. The word itself refers to compensation for loss in general, not just particular types of loss. Thus, *Black's Law Dictionary* defines "Indemnify" as follows:

> To restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure

against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to compensate; to make reimbursement to one of a loss already incurred by him.

*Black's Law Dictionary* 769 (6th ed. 1990). The plain, unambiguous meaning of "indemnify" is not "to compensate for losses caused by third parties," but merely "to compensate."

██ Atari could have limited its obligation to compensate Federated officers to actions brought by third parties, but it did not. Instead, it agreed to indemnify the officers against "all acts and omissions" to the extent permitted by law. Public policy may prohibit one party from contracting out of its liability to another for intentional torts. *See* Farnsworth, *supra*, § 5.2, at 13 and n. 17. But exoneration for fraud is not the issue here. The issue is whether Federated could contract to have Atari indemnify its officers for their legal expenses incurred defending a lawsuit brought by Atari, in which the officers were found to be not liable. We are aware of no public policy precluding indemnification under those circumstances.

██ Pursuant to section 12.7 of the Agreement, the choice of law provision, our interpretation is governed by Delaware law, which construes indemnification provisions liberally. In *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339 (Del.1983), the Delaware Supreme Court construed an indemnification provision in the defendant corporation's bylaws to apply in a "novel" context, reasoning that the bylaw "contain[ed] no limitation on the type of action for which an individual, otherwise qualified under the bylaw, must be indemnified. Indemnity [was] provided for any reasonable expense incurred 'in connection with or resulting from any claim, action, suit or proceeding....'" *Id.* at 343 (quoting bylaw). Because section 9.3 contains no limitations on its application, and because no public policy prohibits its application to expenses incurred as a result of Atari's lawsuit, we hold that section 9.3's language covers the individual defendants in this action. As-

suming the contract is enforceable, section 9.3 requires Atari to indemnify the individual defendants for the attorneys' fees and costs they have occurred defending this action.

Because the district court identified triable issues of fact regarding, and did not rule on, Atari's breach of contract defense to the counterclaim for indemnification, we remand the indemnification issue for further proceedings in accordance with the district court's pretrial rulings. We note that our ruling that Atari did not reasonably rely on the representations and warranties in the Merger Agreement for purposes of its fraud claims does not establish that Atari waived its right to collect damages for their breach or to assert their breach as a defense to enforcement of the Agreement. Those issues are left for the trial court to determine under Delaware law.

The district court's order granting summary judgment for Appellees in No. 91–15668 is AFFIRMED. The court's order denying Appellants' counterclaim in No. 91–15693 is REVERSED, and REMANDED to the court for further proceedings.