259 F.3d 1086 (9th Cir. 2001)
 YANG MING MARINE TRANSPORT CORPORATION, PLAINTIFF-APPELLEE,
v.
OKAMOTO FREIGHTERS LTD., DEFENDANT-CROSS-DEFENDANT,
AND
LAUFER FREIGHT LINES LTD., DEFENDANT-X-CLAIM-3RD-PARTY-PLAINTIFF-APPELLANT,
v.
G.E. INTERNATIONAL INC. (USA); BRITISH AMERICAN TOBACCO; THIRD-PARTY-DEFENDANTS,
OCEANBRIDGE SHIPPING INTERNATIONAL INC., DEFENDANT-CROSS-DEFENDANT-3RD-PARTY-PLAINTIFF,
AND
AMERICAN INTERNATIONAL CARGO, THIRD-PARTY-DEFENDANT-APPELLEE.
 No. 00-55358
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 6, 2001
Filed August 7, 2001
 
 [Copyrighted Material Omitted]
 Counsel Frank X. Dipolito (Argued and Briefed), Swain & Dipolito Llp, Long Beach, California, for appellant Laufer Freight Lines, Ltd.
 Mark A. O'Brien (Argued), Long Beach, California, for appellee Yang Ming Transport Corporation.
 Thomas C. Jorgensen (Briefed), Cogswell, Nakazawa & Chang, Long Beach, California, for appellee Yang Ming Transport Corporation.
 Michael W. Lodwick (Argued and Briefed), Haight, Brown & Bonesteel Llp, Santa Ana, California, for appellee American International Cargo Service, Inc.
 Appeal from the United States District Court for the Central District of California Dickran M. Tevrizian, District Judge, Presiding D.C. No. CV-97-08550-DT
 Before: Procter Hug, Jr., Stephen S. Trott, and William A. Fletcher, Circuit Judges.
 
 Trott, Circuit Judge
 OVERVIEW
 
 1
 In this appeal, we are asked to ascertain the rights and responsibilities of several entities in relation to four separate contracts for the transportation of ten shipping containers from California to Japan. The district court, after addressing eight motions for summary judgment, a motion for reconsideration, and a motion to amend the judgment, held that Yang Ming Marine Transport Corporation ("Yang Ming") was entitled to summary judgment on its indemnity claim against Laufer Freight Systems, Inc. ("Laufer") as a result of Laufer's misdescription of the cargo. The district court also awarded summary judgment to American International Cargo, Inc. ("American") with respect to Laufer's claim for indemnity against American. Laufer timely appeals both adverse rulings. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and AFFIRM in part and REVERSE in part.
 
 DISCUSSION
 1. Background
 
 2
 G. E. International (U.S.A.), Inc. ("G.E."), an agent for Philip Morris, Inc., hired Oceanbridge Shipping International, Inc. ("Oceanbridge"), a non-vessel-operating common carrier ("NVOCC"), to transport ten containers holding cigarettes from Long Beach, California to Tokyo, Japan. Oceanbridge then contracted with American, another NVOCC, to ship the containers from Long Beach to Tokyo. American issued a bill of lading to Oceanbridge identifying Oceanbridge as the "exporter/shipper" and Okamoto Freighters ("Okamoto") as the consignee. The "particulars furnished by shipper" in the bill of lading listed the cargo as ten containers holding "9600 Cases Cigarettes."
 
 
 3
 American, in turn, contracted with Laufer, yet another NVOCC, to transport the containers to Japan. Laufer provided American with a booking report confirming the information provided to Laufer by American and naming American as the "shipper/supplier." Laufer then issued a bill of lading to American designating American as the "exporter, " and describing the cargo as "Cigarettes & Cigars" (the "American/ Laufer Bill of Lading").
 
 
 4
 Finally, on June 16, 1997, Laufer booked a shipment of the ten containers of cargo with Yang Ming, to be carried to Tokyo from Long Beach aboard the M/V SETO BRIDGE. Yang Ming issued a bill of lading to Laufer (the"Yang Ming/ Laufer Bill of Lading") evidencing the contract of carriage and describing the goods as "STC: 9600 CARTONS OF CIGARS & CIGARETTES." The Yang Ming/Laufer Bill of Lading labels Laufer as the "shipper" and Okamoto as the "consignee." Section 7 of the bill of lading provides that the "Merchant" -expressly defined as including the "shipper" -"shall indemnify the Carrier against all loss, damage, expenses, liability, penalties and fines" arising or resulting from a misdescription of the cargo. The bill of lading expressly incorporated by reference the terms of Yang Ming's tariff. A tariff is a public document filed by the carrier and published by the Federal Maritime Commission letting shippers know what services a carrier will furnish under certain conditions and at what price. One such service contemplated by Yang Ming's tariff was the storage of the shipper's cargo at the point of destination in return for a predetermined fee called demurrage.
 
 
 5
 The ten containers were loaded on board the M/V SETO BRIDGE in Long Beach on June 23, 1997, and arrived in Tokyo on July 5, 1997. Upon their arrival in Japan, four of the ten containers were transported by T.S. Shipping Company ("T.S.") to a nearby warehouse where it was discovered that the containers held used tires instead of cigars and cigarettes. T.S. immediately returned the containers to Yang Ming's Tokyo container yard. Japanese Customs officials allegedly informed Yang Ming that the remaining containers also held old tires. Okamoto subsequently notified Yang Ming that it was rejecting the entire shipment and abandoning the containers in Yang Ming's Tokyo container yard.
 
 
 6
 Yang Ming promptly notified Laufer that the containers had been rejected by T.S. and proposed that Laufer coordinate the return of the containers to Long Beach through Okamoto. On July 16, 1997, Yang Ming notified Laufer that"free time" had expired on the ten containers on July 15, 1997, and that demurrage charges were being incurred pursuant to Yang Ming's tariff.
 
 
 7
 Anticipating that Laufer would abandon the cargo, Yang Ming began seeking potential buyers of the tires in Tokyo. Yang Ming discovered that the tires had no commercial value in Japan and that it would cost $25,000 to dispose of the tires in that country. As Yang Ming expected, Laufer sent Yang Ming a written notice of its abandonment of the containers on July 23, 1997.
 
 
 8
 Unwilling to pay the $25,000 disposal fee in Japan, Yang Ming began searching in several countries for potential buyers of the tires. Yang Ming located an individual in Hong Kong who was willing to dispose of the tires free of charge if Yang Ming would absorb all costs arising from the shipment of the containers from Japan to Hong Kong. Yang Ming agreed and used its own vessels to transport the tires to Hong Kong.
 
 
 9
 On November 20, 1997, Yang Ming filed a complaint against Oceanbridge, Laufer and Okamoto, alleging (1) breach of contract, (2) violation of the Carriage of Goods by Sea Act ("COGSA"), (3) negligence, (4) fraud, and (5) negligent misrepresentation.
 
 
 10
 Laufer answered the complaint, filed a cross-claim for indemnity against Oceanbridge and Okamoto, and filed a third-party complaint against American in favor of Yang Ming pursuant to Federal Rule of Civil Procedure 14(c). Oceanbridge filed its own third-party complaint against G.E. seeking indemnification and declaratory relief, and an amended third-party complaint adding Philip Morris, Inc. and British American Tobacco as third-party defendants. American filed a cross-claim against Oceanbridge, G.E., and Philip Morris for (1) intentional misrepresentation, (2) negligent misrepresentation, (3) indemnification, (4) contribution, and (5) declaratory relief.
 
 
 11
 On September 8, 1998, Okamoto filed a motion to dismiss Yang Ming's complaint for lack of personal jurisdiction, which was granted. Pursuant to stipulation by the parties, the district court dismissed without prejudice third-party defendant Philip Morris from the Oceanbridge third-party complaint.
 
 
 12
 On January 15, 1999, Yang Ming moved for summary judgment on its claims for breach of contract and violation of COGSA against Oceanbridge and Laufer. Laufer responded by moving for summary judgment against Yang Ming. American then brought motions for summary judgment against both Yang Ming and Laufer.
 
 
 13
 On February 8, 1999, the district court denied Yang Ming's motion for summary judgment against Laufer and Oceanbridge and granted American's motions for summary judgment against Laufer and Yang Ming. In March of 1999, the district court denied Oceanbridge's motion for summary judgment against Laufer and granted in part and denied in part Oceanbridge's motion for partial summary judgment against Yang Ming. After being presented with additional evidence in May of 1999, the court granted Yang Ming's motion for summary judgment against Laufer and Oceanbridge. Laufer timely appeals the district court's awards of summary judgment to Yang Ming and American.
 
 
 14
 2. Yang Ming's Motion for Summary Judgment Against Laufer
 
 
 15
 To recover indemnity from Laufer pursuant to Section 7 of the Yang Ming/Laufer Bill of Lading, Yang Ming must demonstrate that (1) Laufer breached its warranty as to the accuracy of the particulars, (2) Laufer has no defenses to Yang Ming's claim for indemnity, and (3) Yang Ming's damages are reasonable under the circumstances. See Atlantic Overseas Corp. v. Feder, 452 F. Supp. 347, 351 (S.D.N.Y. 1978). The district court concluded that Yang Ming had satisfied all three requirements and therefore was entitled to summary judgment in the amount of $67,385.63.
 
 
 16
 a. Standard of Review
 
 
 17
 We review de novo a district court's award of summary judgment. Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).
 
 
 18
 b. Breach of Warranty
 
 
 19
 In addressing Laufer's breach of warranty claim, the district court held that Laufer, as the "shipper " of the containers, warranted the description of the contents of the containers both implicitly under COGSA and expressly in Section 7 of the Yang Ming/Laufer Bill of Lading.
 
 
 20
 On appeal, Laufer challenges the district court's holding that COGSA requires a shipper to indemnify a carrier for the misdescription of cargo. We need not address this claim, however, because Laufer expressly concedes in its opening brief that the district court's alternative finding -that Section 7 of the Yang Ming/Laufer Bill of Lading included a shipper's warranty of the description of the cargo -was correct.
 
 
 21
 Laufer asserts that even if the bill of lading required that it provide a correct description of the cargo, there was insufficient evidence proving that it failed to do so. Laufer does not contest the fact that it informed Yang Ming that the ten sealed containers were said to contain cigarettes and cigars. Rather, Laufer alleges that there was insufficient proof that the ten containers held tires instead of cigars and cigarettes. We disagree.
 
 
 22
 The record is replete with documentary evidence demonstrating that the ten containers were filled with old tires rather than cigarettes. One conclusive piece of unrefuted evidence is a letter written by Laufer itself informing Yang Ming that it had investigated the contents of the containers after their arrival in Japan and had concluded that they did not contain cigarettes:
 
 
 23
 Recently, Yang Ming advised that the consignee of the shipments picked-up four containers . . . and returned them for re-shipment back to the U.S. after the Japanese consignee found that the containers were stuffed with junk tires instead of cigarettes as described in the bill of lading issued by the carrier. Alarmed by this information, we have investigated and found that all the containers are likely to have the same worthless cargo and the original supplier of these containers has disappeared."
 
 
 24
 While Laufer notes correctly that this letter was not expressly relied upon by the district court in concluding that the containers held tires, "we may affirm the district court's decision based on any reason finding support in the record. " Welch v. Fritz, 909 F.2d 1330, 1331 (9th Cir. 1990). Laufer points to no evidence suggesting that the containers held anything other than used tires. We therefore affirm the district court's conclusion that Laufer breached the warranty of particulars in Section 7 of the bill of lading.
 
 
 25
 c. Defenses
 
 
 26
 Aside from Laufer's claim that a genuine issue of material fact exists with respect to the actual contents of the ten containers, Laufer raises no defenses in this appeal.
 
 
 27
 d. Damages
 
 
 28
 After concluding that Laufer breached its warranty as to the accuracy of the particulars, the district court calculated the amount of damages flowing from the breach to be $67,385.63. This figure represents: (1) demurrage charges incurred pursuant to Yang Ming's tariff; (2) shifting charges in Tokyo; (3) customs clearance charges in Tokyo; (4) Yang Ming's ocean freight charges from Tokyo to Hong Kong; and (5) terminal handling charges in Hong Kong. Laufer challenges this award on three grounds. First, Laufer contends that the district court misinterpreted the indemnity provision in Section 7, thus causing the court to miscalculate the amount of damages recoverable by Yang Ming. Second, Laufer argues that the district court erred in allowing Yang Ming to recover demurrage without first proving it suffered actual loss. Third, Laufer asserts that Yang Ming had the opportunity to dispose of the tires for $25,000, and therefore cannot recover damages beyond that amount. Each claim is addressed in turn below.
 
 
 29
 i. Calculating Damages
 
 
 30
 The crux of Laufer's first challenge to the district court's damages award is that the district court erroneously interpreted the indemnity provision in the Yang Ming/Laufer Bill of Lading as requiring Laufer to compensate Yang Ming for expenses other than payments made by Yang Ming to third parties. Laufer's argument is unavailing.
 
 
 31
 To resolve Laufer's claim we must interpret the word"indemnify" as it is used in Section 7 of the Yang Ming/Laufer Bill of Lading. "Since the bill of lading is the contract of carriage between shipper and carrier, familiar principles of contract interpretation govern its construction." Henley Drilling Co. v. McGee, 36 F.3d 143, 148 n.11 (1st Cir. 1994) (internal citations omitted). "Contract terms are to be given their ordinary meaning," and "[w]henever possible, the plain language of the contract should be considered first." Klamath Water Users Prot. Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 2000).
 
 
 32
 We have traditionally defined liberally the word"indemnify." See Atari Corp. v. Ernst & Whinney, 981 F.2d 1025 (9th Cir. 1992). In Atari, we reviewed a district court's conclusion that a plaintiff could not seek indemnification from the defendant when there was no third-party claim against the plaintiff. The district court based this conclusion on the premise that "[u]nder the ordinary and usual meaning of the word `indemnify' as used in indemnity contracts, the indemnitor agrees to protect the indemnitee against claims of third parties alien to the contract." Id. at 1031.
 
 
 33
 We rejected this holding by the district court, stating that an indemnitor's obligation to indemnify an indemnitee extends beyond the mere reimbursement of third party claims. Id. ("[T]he district court was wrong to assume that the word `indemnify' necessarily carries with it the baggage of the clauses in which it most frequently appears."). We based our holding on the definition of "indemnify" provided by Black's Law Dictionary, which reads:
 
 
 34
 To restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to compensate; to make reimbursement to one of a loss already incurred by him.
 
 
 35
 Id. at 1031-32 (emphasis added) (quoting BLACK'S LAW DICTIONARY 769 (6th ed. 1990)). Thus, we concluded that "[t]he plain, unambiguous meaning of `indemnify' is not `to compensate for losses caused by third parties,' but merely `to compensate.' " Id.
 
 
 36
 Our holding in Atari forecloses Laufer's argument that it can only be forced to indemnify Yang Ming for payments made to third parties. Under the express terms of Section 7, Yang Ming can recover all "loss, damage, expenses, liability, penalties and fines" it incurred as a result of Laufer's misdescription of the goods, irrespective of whether such damages represent payments made by Yang Ming to third parties.
 
 
 37
 Having clarified the term "indemnify" as it is used in Section 7, we must now calculate the total amount of damages recoverable by Yang Ming from Laufer under the bill of lading as a whole -including damages recoverable by Yang Ming pursuant to both Section 7 and the tariff (which is expressly incorporated into the bill of lading). To compute this figure, we must determine: (1) which of Yang Ming's actions entitle it to compensation from Laufer, (2) which provisions of the bill of lading entitle Yang Ming to compensation for those actions, and (3) the amount of compensation Yang Ming can recover for those actions.
 
 
 38
 The first set of actions for which Yang Ming seeks compensation from Laufer is Yang Ming's storage of the ten containers in its Tokyo holding facility. While it is clear that Yang Ming can recover compensation for such storage, the difficult question is whether Yang Ming's recovery is limited to the type of damages listed in Section 7 -i.e., actual loss resulting from Laufer's misdescription of the cargo -or whether Yang Ming can recover the more lucrative demurrage charges established by the tariff. We believe that the answer to this question varies in relation to the dates during which Yang Ming held the cargo. We have divided the total time during which Yang Ming held the cargo into three separate periods, each of which represents a different rate of compensation recoverable by Yang Ming under different provisions of the bill of lading.
 
 
 39
 The first relevant time period is from July 5, 1997, the date the cargo arrived in Japan, until July 15, 1997. Yang Ming concedes that it is not entitled to recover any compensation from Laufer for storing the containers between these dates. This period of time represents what is commonly referred to in the shipping industry as "free time," during which the shipper must hold the cargo for the receiver free of charge. 1C Benedict on Admiralty §§ 30, 4-38 (7th ed. 1998).
 
 
 40
 The next relevant period of storage was from July 16, 1997, the date demurrage charges began to run on the cargo, until July 23, 1997, the date Laufer abandoned the cargo. The amount of compensation owed to Yang Ming by Laufer during this time is established by Yang Ming's tariff. Specifically, the tariff provides that for every day the cargo remains unclaimed after the expiration of free time, Laufer will be assessed a predetermined amount of demurrage. The amount of demurrage recoverable by Yang Ming is simple; Yang Ming is expressly prohibited by statute from charging demurrage rates greater or less than the demurrage rates listed in its tariff. 46 U.S.C. App. §§ 1707(a)(1); 46 U.S.C. App. §§ 1709(b)(1); Sea-Land Serv. v. Murrey & Son's Co., Inc., 824 F.2d 740, 742-43 (9th Cir. 1987). Laufer's familiarity with, and consent to, the demurrage provision in Yang Ming's tariff is conclusively presumed. See Sea-Land , 824 F.2d at 742. Yang Ming therefore is entitled to recover demurrage at the rate specified in its tariff for its storage of the containers between July 16 and July 23.[1]
 
 
 41
 The last relevant time period extends from July 24, the day after Laufer abandoned the cargo, until the date the containers were removed from the storage facility to be shipped to Hong Kong. After Laufer abandoned the cargo, Yang Ming was no longer storing the containers as a service to Laufer as contemplated by the tariff. Moreover, Laufer had no ownership rights in the cargo subsequent to its abandonment of the containers and thus cannot be said to have benefitted from such storage. Yang Ming therefore cannot argue convincingly that the demurrage provision in the tariff was intended to encompass post-abandonment storage of the containers. Yang Ming accordingly cannot recover demurrage for its storage of the containers after July 23.
 
 
 42
 This is not to say, however, that Yang Ming is precluded from recovering compensation for its storage of the containers after July 23. Section 7 specifies that Laufer must indemnify Yang Ming for all "loss, damage, expenses, liability, penalties and fines" arising or resulting from Laufer's inaccurate description of the cargo. The costs incurred by Yang Ming in storing the containers in its Tokyo holding facility after July 23 unquestionably resulted from Laufer's misdescription of the cargo. Thus, although Yang Ming cannot recover demurrage from Laufer for storing the containers after July 23, it can recover damages from Laufer pursuant to Section 7. We read Section 7 to limit the damages recoverable by Yang Ming to the actual costs it incurred as a result of Laufer's misdescription of the cargo. We leave the calculation of these costs for the district court on remand.
 
 
 43
 The second set of actions for which Yang Ming seeks compensation involves Yang Ming's shipment of the ten containers to Hong Kong. Specifically, Yang Ming seeks indemnity from Laufer for the additional freight and terminal handling costs resulting from this endeavor. To prove the existence of such costs, Yang Ming points to the deposition of one of its employees, Erica Chu, who stated that "[e]ven though the containers were shipped [from Tokyo to Hong Kong ] on board Yang Ming vessels, . . . each container carried associated costs that ha[ve] to be paid by Yang Ming such as vessel costs, bunker costs, staff costs, and lift on/lift off charges, all of which costs Yang Ming paid for these containers. " These costs were incurred by Yang Ming as a result of Laufer's misdescription of the cargo, and therefore can be recovered by Yang Ming pursuant to Section 7 of the bill of lading. However, because Yang Ming's shipment of the cargo to Hong Kong transpired after Laufer abandoned the cargo, Yang Ming cannot recover damages in excess of those contemplated by Section 7. Again, we defer to the judgment of the district court in calculating the actual costs incurred by Yang Ming in shipping the containers to Hong Kong.
 
 
 44
 ii. Proof of Damages or Lost Profits
 
 
 45
 Laufer's second argument in opposition to the district court's award of damages -namely, that Yang Ming must prove actual loss to recover demurrage -is not persuasive. Laufer relies on Trans-Asiatic Oil Ltd. v. Apex Oil Co., in which the First Circuit rejected the proposition that "the mere stipulation of a liquidated sum for demurrage in a charter agreement obviates the need to show actual damages. " 804 F.2d 773, 782 (1st Cir. 1986).
 
 
 46
 The holding in Trans-Asiatic simply does not apply to the demurrage charges incurred by Laufer as a result of Yang Ming's storage of the containers in its Tokyo container yard between July 16 through July 23. The court in Trans-Asiatic premised its conclusion that a carrier must prove damages before receiving demurrage on the assumption that "[d]emurrage compensates a vessel owner for freight it has lost because the vessel was not free when the parties agreed it would be." Id. (quotation omitted) (second emphasis added). Yang Ming is seeking demurrage "for the use of terminal premises by cargo," not for the lost use of its vessel. Such demurrage charges reflect a variety of indirect costs to Yang Ming, "such as rent or amortization and taxes for the premises, and protection of the cargo against fire, theft, and the elements." 1C Benedict on Admiralty §§ 30, 4-39 (7th ed. 1998). Therefore, Yang Ming need not provide any additional proof of damages or lost profits to recover demurrage charges related to its storage of the ten containers in its Tokyo container yard between July 16 and July 23.
 
 
 47
 iii. Failure to Mitigate
 
 
 48
 Laufer additionally contends that Yang Ming failed to mitigate its damages when it elected not to dispose of the tires in Japan for $25,000, and therefore cannot recover damages beyond that amount. This argument lacks merit.
 
 
 49
 It is true that a non-breaching party to a contract has a duty to take reasonable steps to mitigate its damages, and that its failure to do so may prevent it from recovering damages that otherwise could have been avoided. See Buras v. Shell Oil Co., 666 F. Supp. 919, 924 (S.D. Miss. 1987). In select circumstances, this duty includes making reasonable expenditures toward avoiding further damage. See id. However, the non-defaulting party "is not required to make extraordinary expenditures to diminish the harm caused by the act of the party at fault." Id. Stated alternatively:
 
 
 50
 A non-defaulting party to a contract usually is not required to spend more money to avoid further damage, since compelling an innocent party to make additional expenditures to mitigate damages would force upon him risks beyond those he assumed in his contract. However, a party may be required to make expenditures . . . [if] the expenditures are small in comparison to the possible losses . . . . Damages will not be decreased if it is only shown that a substantial expenditure would have minimized the total loss . . . . A party in default is supposed to assume the risk that further expenditures will be needed to remedy his breach, and cannot cast this risk on the plaintiff.
 
 
 51
 22 AM. JUR. 2d Damages §§ 514 (emphasis added).
 
 
 52
 A payment of $25,000 is a "substantial expenditure." Id. Moreover, although Yang Ming's decision to dispose of the containers in Hong Kong rather than disposing of the containers in Japan may ultimately result in charges to Laufer in excess of $25,000, this course of action enabled Yang Ming to limit its out-of-pocket expenses and thus minimize the risk it was forced to undertake as a result of Laufer's misdescription and abandonment of the cargo. We find this factor persuasive given the uncertainty faced by Yang Ming in recovering the $25,000 payment from Laufer. We accordingly conclude that Yang Ming acted reasonably in shipping the tires to Hong Kong rather than paying the $25,000 disposal fee in Japan.
 
 
 53
 3. American's Motion for Summary Judgment Against Laufer
 
 
 54
 Laufer challenges the district court's grant of summary judgment to American on the ground that the court's decision was premised on an erroneous interpretation of the American/ Laufer Bill of Lading. Specifically, Laufer challenges the district court's conclusion that the bill of lading does not require American to indemnify Laufer for damages resulting from American's misdescription of the cargo.
 
 
 55
 Contract interpretation is a question of law we review de novo. Mendler v. Winterland Prod., Ltd., 207 F.3d 1119, 1121 (9th Cir. 2000).
 
 
 56
 The American/Laufer Bill of Lading is printed on a standardized form used by Laufer to memorialize shipping agreements. On the front of the form are several empty boxes bearing labels such as "PORT OF LOADING/EXPORT," "EXPORTER," and "DESCRIPTION OF COMMODITIES." On the American/Laufer Bill of Lading, Laufer printed American's name in the box marked "EXPORTER." The form contained no alternative boxes bearing the title "shipper" or "merchant" in which Laufer reasonably could have placed American's name. On the back of the bill of lading are several clauses containing boilerplate language delineating the responsibilities of various parties, none of which references "exporters."
 
 
 57
 In seeking indemnity against American, Laufer relies on Clause 21 of the bill of lading, which states:
 
 
 58
 The Merchant, whether principal or agent, by packing or loading the cargo unit and/or by allowing the cargo unit to be so packed or loaded, represents, guarantees and warrants (a) that the Goods are properly described, marked and safely packed in their respective cargo units . . . , [and] (b) that all particulars with regard to the cargo units and their contents and the weight of each said cargo unit, are in all respects correct . . . .
 
 
 59
 The term "Merchant" is defined by the bill of lading as including "the shipper, the consignee, the receiver, the holder of this bill of lading, the owner of the Goods or person entitled to the possession of the Goods and the servants or agents of any of these." (emphasis added).
 
 
 60
 Laufer argued to the district court that American qualified as a "Merchant" under the bill of lading because it was a "shipper." The district court rejected this argument, concluding that the bill of lading expressly listed American as an "EXPORTER" rather than a "shipper." Laufer believes this constitutes an overly technical interpretation of the contract and that the evidence sufficiently demonstrates that the parties intended to treat American as a "shipper" under the bill of lading. We agree with Laufer.
 
 
 61
 To properly interpret a bill of lading we must "effectuat[e] the intents and understandings of the parties to the bill of lading." Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 104 (2d Cir. 1998). "The most obvious place for us to begin our search for the intent of the contracting parties is, of course, the bill of lading." Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 485 (2d Cir. 1985). If the bill of lading fails to evince the clear intent of the parties, we may consider collateral evidence of the parties' intentions, including "other shipping documents." Royal Ins. Co. v. M.V. ACX RUBY, 1998 WL 524899, at *8 (S.D.N.Y. 1998); see also Seguros Illimani S.A. v. M/V POPI P, 929 F.2d 89, 94 (2d Cir. 1991) (looking to other shipping documents to determine parties' intent); Francosteel Corp. v. M/V KAPETAN ANDREAS G, 1993 WL 496893, at *3 (S.D.N.Y. 1993) ("The Court recognizes that it can look to parole [sic] evidence to resolve the ambiguity in the Bill of Lading . . . .").
 
 
 62
 Here, the terms used in the American/Laufer Bill of Lading are of little help. We cannot conclusively discern from the bill of lading whether American, which is described on the bill as an "EXPORTER," was intended by the parties to qualify as a "shipper." While nothing in the bill of lading suggests that the parties intended to use the terms "exporter" and "shipper" interchangeably, there is also nothing in the bill suggesting that the parties intended the terms to be mutually exclusive. Notably, American has failed to produce any evidence indicating that an exporter is not a type of shipper, or at least that the two terms are not used interchangeably in the shipping industry.
 
 
 63
 Receiving little guidance from the bill of lading, we turn to other shipping documents evidencing the intent of American and Laufer. Seguros, 929 F.2d at 94. Specifically, we rely upon the booking report given to American by Laufer just prior to Laufer's issuance of the American/Laufer Bill of Lading. This report expressly references American as the "shipper/supplier." The accuracy of this label was never challenged by American and therefore is indicative of the parties' understanding that American was a "shipper" in relation to Laufer.
 
 
 64
 While Laufer undeniably could have drafted a clearer bill of lading expressly labeling American as a"shipper" or including the word "exporter" within the bill's definition of the term "Merchant," its failure to do so is not dispositive. Viewing the evidence as a whole, including the booking report, we find no genuine issue of material fact regarding the intent of Laufer and American to treat American as a"shipper" under the American/Laufer Bill of Lading. We therefore conclude as a matter of law that American falls within the ambit of Clause 21 of the American/Laufer Bill of Lading. We reject all of American's arguments to the contrary.
 
 
 65
 American contends that even if it does fall under Clause 21 of the American/Laufer Bill of Lading, it is immunized by the Pomerene Act from liability arising from its misdescription of the goods. 49 U.S.C. §§ 80101-80116 (2000). American is mistaken. The Pomerene Act provides carriers with immunity against claims for misdescribed cargo when the carrier qualifies the description of the cargo in the bill of lading with the phrase "said to contain" or similar language. Id. at §§ 80113(b). Without addressing American's qualification as a "carrier" under the Pomerene Act, we note simply that the American/Laufer Bill of Lading does not contain the phrase "said to contain" or any equivalent language. The Pomerene Act therefore is inapposite.
 
 CONCLUSION
 
 66
 For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Yang Ming, but REVERSE and REMAND the district court's award of damages to Yang Ming. We additionally REVERSE and REMAND the district court's award of summary judgment to American. The parties shall bear their own costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 Laufer contends that Yang Ming's tariff does not specify for whose account the demurrage is assessed or paid; however,"[u]nder well-established principles of admiralty law, demurrage is `extended freight.' Accordingly, one who undertakes to guaranty the costs of ocean freight is secondarily liable for any demurrage incurred." Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc., 743 F.2d 85, 92 (2d Cir. 1984) (internal citations omitted). Laufer does not challenge the fact that it contracted and paid for the ocean freight. Therefore, Yang Ming is entitled to recover demurrage from Laufer.