PUBLISH

Filed 05-15-02

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JOHN D. ALLISON; WILLIAM C. HOPKINS, JR.; GALEN G. MCFAYDEN; KIRK R. PETERSON; JULIE E. PETERSON; JOHN W. LATTA; NANETTE B. LATTA; JAMES T. LINK,

    Plaintiffs-Counter-Defendants-Appellants,

    v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

    Defendant-Counter-Claimant-Appellee.

No. 99-1465

---

ROGER K. CROSBY, Trustee of the Trust created under the Crosby Group, Inc. Profit Sharing Plan,

    Plaintiff-Appellant,

    v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

    Defendant-Appellee.

No. 99-1466

JOHN D. ALLISON; WILLIAM C. HOPKINS, JR.; GALEN G. MCFAYDEN; KIRK R. PETERSON; JULIE E. PETERSON; JOHN W. LATTA; NANETTE B. LATTA; JAMES T. LINK,

      Plaintiffs-Counter-Defendants-Cross-Appellees,

      v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

      Defendant-Counter-Claimant-Cross-Appellant.

No. 99-1487

---

ROGER K. CROSBY, Trustee of the Trust created under the Crosby Group, Inc. Profit Sharing Plan,

      Plaintiff - Cross-Appellee,

      v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

      Defendant-Cross-Appellant.

No. 99-1490

JOHN D. ALLISON; WILLIAM C. HOPKINS, JR.; GALEN G. MCFAYDEN; KIRK R. PETERSON; JULIE E. PETERSON; JOHN W. LATTA; NANETTE B. LATTA; JAMES T. LINK,

     Plaintiffs-Counter-Defendants - Appellees,

     v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

     Defendant-Counter-Claimant - Appellant.

No. 01-1208

---

ROGER K. CROSBY, Trustee of the Trust created under the Crosby Group, Inc. Profit Sharing Plan,

     Plaintiff-Appellee - Cross-Appellant,

     v.

BANK ONE - DENVER, formerly known as Affiliated National Bank - Denver, formerly known as Denver National Bank, a national banking association,

     Defendant-Appellant - Cross-Appellee.

No. 01-1211 and
No. 01-1240 (Cross-Appeal)

-3-

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. Nos. 91-WM-1422 and 91-WM-1423)**

James H. Marlow (Dwight A. Hamilton, Clyde A. Faatz, Jr. and Christopher J.W. Forrest, on the briefs), Hamilton & Faatz, P.C., Denver, Colorado, for the Appellants - Cross-Appellees Roger K. Crosby, Trustee of the Trust created under the Crosby Group, Inc. Profit Sharing Plan; John D. Allison; William C. Hopkins; Jr., Galen G. McFayden, Kirk R. Peterson, Julie E. Peterson, John W. Latta, Nanette B. Latta; and James T. Link.

James R. Cage (and Rita J. Bonessa, on the briefs), Cage Williams Abelman & Layden P.C., Denver, Colorado, for the Appellee - Cross-Appellant Bank One - Denver.

Before **TACHA**, Chief Judge, **KELLY**, and **HARTZ**, Circuit Judges.

**KELLY** , Circuit Judge.

Plaintiff-Appellant Roger K. Crosby ("Crosby Plaintiff"), as Trustee of the Crosby Group, Inc. Profit Sharing Plan (the "Plan"), and a group of Individual Retirement Account ("IRA") holders (collectively, the "Allison Plaintiffs"), filed suit against Defendant-Appellee Bank One-Denver ("Bank One") alleging violations of federal securities laws, Colorado securities laws, ERISA, 29 U.S.C. § 1104(a), RICO, 29 U.S.C. § 1961, the Colorado Organized Crime Control Act (COCCA), Colo. Rev. Stat. §§ 18-17-101 to 18-17-109, and violations of Colorado common law. Bank One asserted a counterclaim against the Allison Plaintiffs alleging a breach of an indemnity and hold-harmless agreement

-4-

("Indemnity Agreement"). The district court dismissed the RICO and COCCA

claims prior to trial and they are not the subject of these appeals. After a full

trial, the jury found in favor of the Crosby Plaintiff on its ERISA claim, but found

in favor of Bank One on all of the Plaintiffs' remaining claims. In addition, the

jury found that the Allison Plaintiffs had breached the Indemnity Agreement and

assessed damages of one dollar against each Plaintiff. Subsequent to trial, the

district court reversed its earlier conclusion that the jury should determine the

ERISA claim and instead made its own findings of fact and held the Bank liable

for violation of ERISA, but cut-off Bank One's liability as of January 1, 1988.

Before us are the parties' appeals and cross-appeals arising from the district

court's rulings, including its post-judgment decisions regarding costs.[1] We have

jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm in part, reverse in part,

and remand for further proceedings.


**Background**

Crosby Plaintiff

In June 1984 the Crosby Group, Inc., an architectural and engineering firm,

appointed Bank One (successor to Denver National Bank) to act as trustee of the

---

[1]The appeal and cross-appeal related to the district court's judgment regarding costs is before us in a separate appeal. Because the appeals share identical facts and a common record, we have companioned them for disposition. See Fed. R. App. P. 3(b).

Plan. Approximately eight months later, Bank One invested a portion of the Plan's assets in a limited partnership in which Hedged Investment Associates, Inc. ("Hedged") served as the general partner. James D. Donahue was the president of Hedged and was responsible for the limited partnership's day-to-day operations as well as its investment decisions.

In 1987, Bank One's sole investment manager in the office that serviced the Plan resigned, prompting the bank to discontinue managing assets for its trust department customers. In doing so, Bank One presented the Plan with the option of either converting to a "participant-directed" plan, or moving the Plan to another institution that would manage its assets. Aplee. App. at 102. The Plan's Advisory Committee, composed of Crosby Group officers and employees, held a meeting on December 29, 1987 and unanimously approved a proposal to permit self-direction of accounts by participants. VI Aplt. App. at 2319. Bank One's Trust Committee received the minutes of the Advisory Committee meeting and unanimously approved the participants' election to convert to a participant-directed plan. Id. at 2418–19. The Advisory Committee subsequently sent a memorandum to the Plan's participants indicating that they had the right to self-direct their accounts into one or more of six investment options, including Hedged. Aplee. App. at 104. As eventually directed, Bank One placed 100

percent of each participant's investment into Hedged. The Plan contained the following provision:

> 8.10 PARTICIPANT DIRECTION OF INVESTMENT. A Participant shall have the right to direct the Trustee with respect to the investment or re-investment of the assets comprising the Participant's individual account only if the Trustee consents in writing to permit such direction. If the Trustee does consent . . . the Trustee and each Participant shall execute a letter agreement as a part of this Plan containing such conditions, limitations, and other provisions they deem appropriate before the Trustee shall follow any Participant direction . . . . The Trustee shall not be liable for any loss, or by reason of any breach, resulting from a Participant's direction of the investment of any part of his individual account.

VI Aplt. App. at 2356. Bank One admits that no Letter Agreement as provided for in section 8.10 of the Plan was executed. Aplee. Br. at 14.

Allison Plaintiffs

In 1987 each of the Allison Plaintiffs established an IRA with Bank One directing that 100 percent of his or her respective account's assets be invested in Hedged. Each Allison Plaintiff received and signed an Authorization for the Purchase of Limited Partnership Units ("Authorization"), VI Aplt. App. at 2324, an Adoption Agreement, id. at 2325, and a Custodial Agreement, id. at 2249–2258. The Authorization included the following provisions:

> 1. I have read and understand the provisions contained in the partnership prospectus or offering circular, and have determined that my retirement account and my circumstances meet the suitability requirements set forth in the Prospectus and the Financial Disclosure Statement. . . .

-7-

4. I agree to indemnify and hold [Bank One] harmless from and against any claim whatsoever that the investment is not prudent, proper, or otherwise in compliance with the terms and conditions of [ERISA], or any other applicable federal or state law . . . .

Id. at 2324. The Adoption Agreement, which incorporates the Custodial Agreement by reference, indicates by a checked box that Bank One would serve as the custodian and further that: "I/we having read the Custodial Agreement, understand if the Bank acts as Custodian . . . it will not have any discretionary investment responsibility . . . and would invest and reinvest . . . solely on my/our written direction . . . ." Id. at 2325. The Custodial Agreement contains two provisions relevant to this case:

6.03 Custodian Limitation on Liability. [Bank One] shall not be liable for the acts or omissions of Participant [and] shall not have any responsibility nor any liability for any loss of income or capital . . . relating to any investment . . . . which the Participant . . . directs [Bank One] to make.

Id. at 2255.

9.03 Indemnity of Custodian. The Participant indemnifies and saves harmless the Custodian from and against any and all loss resulting from liability to which the Custodian may be subjected by reason of any act or conduct (except willful misconduct or gross negligence) in its official capacities in the administration of this Fund or Plan, or both, including all expenses reasonably incurred in its defense. . . .

Id. at 2257.

Collapse of Hedged and Trial

-8-

In August 1990, Donahue informed investors that Hedged had sustained significant unforeseeable losses due to investments in uncovered calls on United Airlines stock options. Subsequently, Donahue and Hedged declared bankruptcy and Donahue pleaded guilty to criminal securities fraud. All of the money invested in Hedged by Bank One on behalf of the Plan and the Allison Plaintiffs was lost. The Plaintiffs then brought their lawsuits and the cases were consolidated pursuant to the parties' stipulation.

The district court made a number of rulings prior to and during the trial. First, the parties disputed whether the Plan's ERISA claim could be resolved by a jury. The district court concluded that the nature of the claim was for damages and should go to the jury. Second, the court ruled that the Allison Plaintiffs must prove intentional or willful or wanton conduct on the part of Bank One because the Indemnity Agreement prevented an ordinary negligence cause of action. In relation to this ruling, the district court also ruled that Bank One would be able to recover reasonable expenses, but not attorney's fees because Colorado law prevented such recovery unless stated explicitly in an indemnity agreement. Finally, during trial but before conclusion of the case, the district court ruled that the Plan had become participant-directed by amendment beginning on January 1, 1988, and, as a result, ended Bank One's fiduciary duty to the Plan as of that date.

The district court submitted the case to the jury, but withheld any decision regarding damages on the securities and ERISA claims. The jury found for Bank One on each claim with the exception of the Crosby Plaintiff's ERISA claim for breach of fiduciary duty. The jury also found for Bank One on its counterclaim for breach of the Indemnity Agreement and awarded one dollar in damages against each Allison Plaintiff. In a subsequent Combined Order and Judgment, however, the district court reversed its decision regarding submission of the ERISA claim to the jury. The court instead made findings of fact, including a finding that Bank One would have discovered the fraudulent nature of Hedged had it performed an independent audit of the company. The court thus held that Bank One had violated its fiduciary duty by not adhering to the prudent man standard of care under ERISA, but terminated liability as of December 31, 1987 based on its previous conclusion that, beginning on January 1, 1988, the Plan became participant-directed and Bank One no longer had any discretionary investment authority. The court determined that the lost funds attributable to Bank One's breach were $123,823.58, and assessed moratory interest to assure that some earnings or profits would be credited to the Plan. The court used Colorado's statutory interest rate of eight percent, Colo. Rev. Stat. §§ 5-12-102(1), (2), as the rate for moratory interest resulting in a total damages award to the Plan of $247,877.82 as of December 31, 1998.

**Jurisdiction**

Before addressing the merits in this case, we must address a jurisdictional issue referred to us. The district court entered its Combined Order and Judgment on the ERISA claim on August 30, 1999. Under Fed. R. App. P. 4(a)(1), a party has thirty days from entry of judgment to file a notice of appeal; thus, the original due date for the notice of appeal was September 29, 1999. The plaintiffs filed a motion for extension of time to file their notice of appeal with the district court and the district court granted the motion based on the factual averments relating to good cause or excusable neglect. See Fed. R. App. P. 4(a)(5)(i)–(ii) (requiring a motion for an extension *and* a showing of excusable neglect or good cause). On November 22, 1999, the clerk of court, pursuant to 10th Circuit Rule 27.2, issued an order to show cause why the grant of an extension to file the notice of appeal was proper. Both parties submitted briefs on the issue of good cause, but we now conclude that no extension was required because no judgment or order has been "entered" as defined in Fed. R. App. P. 4(a)(7).

Fed. R. App. P. 4(a)(1) requires a party to file its notice of appeal within thirty days after the "entry of the judgment or order appealed from . . . ." Under Rule 4(a)(7), a judgment or order is "entered for purposes of this Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil

Procedure." Fed. R. Civ. P. 58 states that "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." The district court's Combined Order and Judgment on ERISA Claim is fifteen pages long, contains detailed legal analysis along with citations, and provides for entry of judgment, but the district court never entered a separate judgment. The Supreme Court has recognized that the separate-document rule must be "mechanically applied" in determining whether an appeal is timely, Bankers Trust Co. v. Mallis, 435 U.S. 381, 386 (1978) (internal citation omitted), and has stated further that, "absent a formal judgment," a district court's order remains appealable. Shalala v. Schaefer, 509 U.S. 292, 303 (1993). Although parties may waive Rule 58's separate-document requirement by allowing an appeal to go forward, see Bankers Trust, 435 U.S. at 384, such waiver cannot be used to defeat appellate jurisdiction. Clough v. Rush, 959 F.2d 182, 186 (10th Cir. 1992). Finally, because "[e]fficiency and judicial economy would not be served by requiring the parties to return to the district court to obtain a separate judgment," we accept jurisdiction and address the merits of the appeals in this case. Clough, 959 F.2d at 186; see also Bankers Trust, 435 U.S. at 385 (stating that "nothing but delay would flow from requiring the court of appeals to dismiss the appeal. . . . Wheels would spin for no practical purpose").

## Discussion

*Appeal Nos. 99-1465, 99-1466, 99-1487, 99-1490*

<u>Crosby Plaintiff</u>

On appeal, the Crosby Plaintiff raises two issues: (1) the district court erred in ruling that the Plan became participant-directed by amendment as of January 1, 1988, and in its Combined Order and Judgment when it concluded Bank One ceased to be a Trustee as of that same date; and (2) even if the Plan did become participant-directed as of January 1, 1988, the district court erred in ruling that Bank One had no ongoing fiduciary duty to the Plan after that date. We apply a *de novo* standard of review to questions of law decided by the district court, and "[i]n interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." <u>Chiles v. Ceridian Corp.</u>, 95 F.3d 1505, 1511 (10th Cir. 1996); <u>Pirkheim v. First UNUM Life Ins.</u>, 229 F.3d 1008, 1010 n.2 (10th Cir. 2000).

<u>Purported Amendment of Plan</u>

In its Combined Order and Judgment, the district court concluded that the Advisory Committee's unanimous approval to convert the Plan to a participant-directed plan, the notices to participants, Bank One's acquiescence, and the fact

that all the parties involved with the Plan proceeded as if the Trustee had been changed as of January 1, 1988, resulted in amending the Plan into a participant-directed plan. V Aplt. App. at 1916 (Combined Order and Judgment at 7). The Crosby Plaintiff raises several arguments in opposition to this ruling, while Bank One claims the record contains ample evidence to support the ruling.

The Crosby Plaintiff contends that the change to participant-direction was not an amendment to the Plan because a provision for just such a change was already in the Plan document. Section 8.10 of the Plan, set out in pertinent part, *supra*, provides a participant with the ability to direct his or her own investments upon written consent from the Trustee. Pursuant to this provision, the Trustee and participant are to execute a Letter Agreement "containing such conditions, limitations, and other provisions they deem appropriate." Clearly, the Plan contained a description of the procedures necessary to allow each participant to self-direct investments. The plain language of the Plan documents, as well as case law from other circuits, supports the Crosby Plaintiff's argument that the switch to participant-direction was not an amendment to the Plan.

In Dooley v. Am. Airlines, Inc., 797 F.2d 1447 (7th Cir. 1986), the court addressed whether a plan administrator's change to actuarial assumptions in certain plan provisions constituted an amendment to the plan. The plan administrators had changed the actuarial assumption used in calculating lump-sum

payments from a fixed 8 ½ percent fixed rate to a significantly higher floating rate, resulting in reduced lump-sum payments.  Id. at 1449.  Retirees brought an ERISA action, claiming the "amendment" had resulted in reduced accrued benefits and violated 29 U.S.C. § 1054(g).  The court looked to the actual pension document, and noted that the calculation of lump-sum payments was to be done pursuant to the "'Actuarial Equivalent of an annuity payable for the lifetime of the Member.'"  Id. at 1451 (quoting pension document).  The court then pointed out that the "Actuarial Equivalent" was defined in the pension documents as "'the equivalent in value on the basis of actuarial factors *approved from time to time by American Airlines . . . .*'"  Id. (quoting pension document) (emphasis added in original).  Stating that "we are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which was already firmly ensconced in the pension document," the court ruled that taking action pursuant to the pension documents was not an amendment.  Id. at 1452.

The Dooley court relied on a case from the D.C. Circuit, where the court stated:  "The district court found, and the plaintiffs admit, that there was no 'amendment' to the plan in the 'technical' sense—*i.e.*, an actual change in the provisions of the plan.  True.  All that happened was that § 2.09, a provision already incorporated into the plan, was *applied*."  Stewart v. Nat'l Shopmen Pension Fund, 730 F.2d 1552, 1561 (D.C. Cir. 1984).  We agree with this

reasoning and conclude that the change to participant-direction constituted an exercise of § 8.10 of the Plan (although not done in accordance with the provision itself, an issue we address *infra*), and was not an amendment. See Krumme v. Westpoint Stevens, Inc., 143 F.3d 71, 85 (2d Cir. 1998) (citing Dooley and Stewart); Oster v. Barco of Cal. Employees' Ret. Plan, 869 F.2d 1215, 1220–22 (9th Cir. 1989) (same). Because we conclude that the change to participant-direction was not an amendment, it is unnecessary to address the Crosby Plaintiff's argument that the purported amendment did not comply with the Plan's formal amendment procedures. See Miller v. Coastal Corp., 978 F.2d 622, 624 (10th Cir. 1992) (stating that ERISA requires all modifications to an employee benefits plan to be written and must conform to the formal amendment procedures).

Bank One contends that the Advisory Committee's unanimous resolution for the Plan to become self-directed necessarily entailed an amendment to § 8.10, including the requirement for a Letter Agreement. We find this assertion unavailing. The memorandum the Advisory Committee sent to the Plan's participants states specifically that it provides guidelines to "allow participants to direct their portion of the profit sharing plan." Aplee. App. at 140. Furthermore, Bank One's Trust Committee minutes regarding the change to participant-direction state that "the Crosby Group *participants* have elected to self-direct."

-16-

VI Aplt. App. at 2418 (emphasis added); see also Aplee. App. at 102 (cross-examination of Louise Crosby) ("Q. And didn't the participants want to go self-directed so that they could make their own decisions with respect to the plan? A. They wanted to go self-direction because the bank had told us that we were going to have to do it anyway . . ."). Our review of the record reveals that the Advisory Committee's resolution was simply an insufficient step in performing the requirements of § 8.10, and that Bank One recognized the actions taken by all parties involved to be pursuant to that section of the Plan.

Unlike the dissent, we are unwilling to deem the Plan amended by virtue of an ambiguous memorandum from the Plan Advisory Committee (not the Plan Administrator) to the Plan participants.[2] The memorandum largely explains the

---

[2] Nor do we agree with the dissent's characterization of this issue as one of fact, subject to a clearly erroneous standard of review. The district court concluded that the parties intended to convert to participant direction (a proposition no one disputes), but then relied on case law to determine that the collection of documents, together with that intent, constituted an amendment. V Aplt. App. at 1916. The issue is more akin to a mixed question of law and fact in which the legal issues predominate. In addition, the issue is necessarily intertwined with the application of ERISA's fiduciary duty statutes, including 29 U.S.C. § 1104(a)(1)(D) (requiring fiduciaries to act in accordance with plan documents), 29 U.S.C. § 1104(c)(1)(B) (providing an exemption from liability when a participant's exercise of control results in a loss), and 29 U.S.C. § 1102(a)(1) (requiring a plan to be established and maintained pursuant to a written instrument). As such, we utilize a *de novo* standard of review. Rosette, Inc. v. United States, 277 F.3d 1222, 1226 (10th Cir. 2002) ("The construction and applicability of a federal statute is a question of law, which we review *de novo*.") (citation omitted); Supre v. Ricketts, 792 F.2d 958, 961 (10th Cir. 1986) (conducting a *de novo* standard of review where the "mixed question primarily
(continued...)

-17-

mechanics of self-direction, rather than addressing a mandatory change to self-direction and its consequences vis-a-vis the Plan. Of critical importance, the Plan already provided for self-direction in accordance with § 8.10, upon <u>advance</u> agreement of the trustee and each participant as to the terms, conditions and limitations of the relationship.

The dissent also points out that the <u>Dooley</u> and <u>Stewart</u> cases arose on distinguishable facts, but, as the Seventh Circuit stated in noting that the facts in <u>Dooley</u> were distinguishable from those in <u>Stewart</u>, "[<u>Stewart</u>'s] commonsensical rule of law is nonetheless applicable here." <u>Dooley</u>, 797 F.2d at 1452. In other words, when an ERISA fiduciary performs acts for which an established written procedure is in place, courts should not strain to allow the fiduciary to unilaterally declare that it was operating pursuant to an "amended" procedure, and thereby exclude procedures intended to protect a plan's beneficiaries. Indeed, it is telling that the memorandum on which Bank One relies does not resolve the interrelationship between § 8.10 and the procedure envisioned in the memorandum. Moreover, this presents an unusual case where neither the employer nor the participants argue the Plan was amended, but only Bank One, who signed up to be an ERISA fiduciary. Finally, while not necessary to our resolution of the case, a substantial question remains as to whether the purported

---

[2](...continued)
involve[d] the consideration of legal principles . . . .") (citation omitted).

amendment would even fulfill the minimal requirements stated in § 14.02 of the Plan. See VI Aplt. App. at 2371 ("The Employer shall make all amendments in writing. Each amendment shall state the date to which it is either retroactively or prospectively effective."). If indeed the memorandum was ever intended to function as a Plan amendment, its lack of a clear effective date, as called for by the Plan's amendment provisions, indicates a rather cavalier approach to such an important modification of the Plan.

The absence of any reference to § 8.10 and the informality attendant to the memorandum provided to the participants distinguishes this case from those cases, cited in the dissenting opinion, where formal documents concerning plan termination served as plan amendments, though not labeled as such. Horn v. Berdon, Inc. Defined Ben. Pension Plan, 938 F.2d 125, 127 (9th Cir. 1991) (holding that a corporate resolution directing that plan assets be distributed to plan beneficiaries upon sale of the company was an amendment); Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 75 (1995) (presuming that a summary plan description providing that health care benefits terminated when business operations terminated was intended as an amendment). Likewise, this case is distinguishable from Normann v. Amphenol Corp., 956 F. Supp. 158, 163 (N.D.N.Y. 1997), where a pension committee of the board of directors adopted a resolution amending a plan (reducing early retirement benefits) and less than a

month later the resolution was ratified by a full board of directors and another pension committee.

This circuit has recognized that the requirement of formal amendments reflects ERISA's overall goal of protecting "'the interests of participants in employee benefit plans and their beneficiaries.'" Miller, 978 F.2d at 624 (quoting 29 U.S.C. § 1001(b)). Notwithstanding the Supreme Court's indication in Curtiss-Wright that *ex post* events might ratify a company's intended amendment to a plan, 514 U.S. at 85, informal communications, whether they be oral or written, frequently will lack sufficient indicia of intent to amend. Resort to a plan's terms in the event of a dispute should not require the prescience of a clairvoyant as to whether an amendment has occurred. We have repeatedly rejected efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit. See, e.g., Pratt v. Petroleum Prod. Mgmt. Inc. Employee Sav. Plan & Trust, 920 F.2d 651, 662 (10th Cir. 1990); Straub v. Western Union Telegraph Co., 851 F.2d 1262, 1266 (10th Cir. 1988). Given these concerns, it would be contrary to our precedent to allow the Bank to avoid the Letter Agreement requirement of § 8.10 of the Plan by means of a post-hoc rationalization. Although the dissent maintains repeatedly that all of the parties understood the change to self-direction, it is certain that the participants were not informed of any substantive modification to the protection stemming from § 8.10.

-20-

See Member Serv. Life Ins. Co. v. Am. Nat'l Bank & Trust Co., 130 F.3d 950, 956–57 (10th Cir. 1997) (discussing the need to "'enable plan beneficiaries to learn their rights and obligations at any time'" (quoting Curtiss-Wright, 514 U.S. at 83)); Pratt, 920 F.2d at 662 (10th Cir. 1990) (where Plan document unambiguously addressed valuation procedure, Plan was bound to honor it). As such, under our law, the cobbled-together collection of meeting minutes and informal communications does not qualify as an amendment.

Concluding that the Plan was not amended does not end our analysis. The possibility remains that, despite not having complied in full with the requirements of § 8.10 of the Plan, Bank One met its obligation by way of estoppel or by performing substantially equivalent procedures. Though we do not consider this an amendment, Bank One's application of § 8.10 departs substantially from the terms of that section and we have been most reluctant to enforce deviations from plan language (whether considered plan amendments, modifications or deviations) on estoppel theories. See Averhart v. U.S. West Mgmt. Pension Plan, 46 F.3d 1480, 1485-87 (10th Cir. 1994). We have, however, recognized that the doctrine of substantial compliance may have application in ERISA cases, and this would perhaps serve the dissent's concern over the technical requirements of ERISA that saddle its hypothetical small business. Be that as it may, we have limited the application of the substantial compliance doctrine where it would deprive a party

-21-

of the benefits of clearly-defined written procedures contained in a plan. See

Peckham v. Gem State Mut. of Utah, 964 F.2d 1043, 1052-53 (10th Cir. 1992)

(concluding that plan participant's state-law substantial compliance argument was

not preempted by ERISA). But see Phoenix Mut. Life Ins. Co. v. Adams, 30 F.3d

554, 559 (4th Cir. 1994) (holding that doctrine of substantial compliance is

preempted). Even were we to assume, but not decide, that a plan fiduciary could

rely on Peckham's substantial compliance analysis, we would conclude that the

law of ERISA, applied to this record, leaves no room for a substantial compliance

argument given the requirement that a fiduciary apply the terms of a written plan

and the unambiguous nature of the provision before us.

ERISA requires a fiduciary, a status that Bank One does not contest it had

at the time it attempted to change the Plan to participant-direction, to "discharge

his duties with respect to a plan solely in the interest of the participants and

beneficiaries and — . . . in accordance with the documents and instruments

governing the plan insofar as such documents and instruments are consistent with

[ERISA]." 29 U.S.C. § 1104(a)(1)(D); see also Restatement (Second) of Trusts, §

106 (1959) ("A trustee who has accepted the trust cannot resign except . . . (b) in

accordance with the terms of the trust."). Allowing Bank One to avoid

Congress's requirement that it act in accordance with the plan documents would

"undermine the protection afforded by ERISA's requirements." Miller, 978 F.2d

at 624. Indeed, because ERISA's requirements are designed "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C. § 1001(b), we will not create a theory of federal common law that would run contrary to the overall intent of ERISA. See id. at 625 (refusing to create a federal common law allowing oral modification of an ERISA plan). Further, as we discuss below, the record does not support substantial compliance with the terms of § 8.10, and allowing it to suffice for the duties in that section would deprive plan participants (and the trustee) of the benefits of its clearly defined procedures.

Compliance with § 8.10 of the Plan requires a letter *agreement* between the Trustee and a Participant to insure a meeting of the minds as to the terms, conditions and limitations of self-direction, and is not, as the dissent portrays it, a procedure with which the participants are exclusively burdened. A sample of the Letter Agreement described in § 8.10 of the Plan indicates that each participant would have been informed that Bank One would be absolved "from any and all liability or responsibility for any loss resulting . . . by reason of any sale or investment made or other action taken pursuant to and in accordance with the direction." VI Aplt. App. at 2323. Bank One asserts that it did inform the Plan participants that their investments would not be monitored by the bank. However, the exhibit it presumably relies upon, see Aplee. App. at 159 (miscited by Bank

One, Aplee. Br. at 11–12 as 152), is a letter to merely one Crosby plan participant dated January 26, 1988, discussing the liquidity of Hedge and explaining that Hedge had 90 days after receiving a redemption request to honor it. As a parting thought, the memo advises the plan participant that Bank One "does not monitor the activities of the partnership. By your direction you accept the responsibility for this investment." Aplee. App. 159. This after-the-initial-investment statement simply does not fulfill, in a timely or complete manner, all the purposes of § 8.10, nor does an internal Crosby Group memo describing participant direction of investments, Aplee. App. 140 (cited by Bank One, Aplee. Br. at 17). Although Bank One also points to testimony showing that "several" participants met with Mr. Donahue regarding Hedged, see Aplee. App. at 98, 117, 128, the testimony reveals the meeting lasted only a half-hour to forty-five minutes and reveals no discussion regarding Bank One's discontinuation of any responsibility regarding the investment. See id. at 128. We do not view our decision as one that, as the district court put it, "elevat[es] form over the reality of conduct." V Aplt. App. at 1916 (Combined Order and Judgment at 7). The failure to execute the Letter Agreement implicated much more than mere formalities, but went to the very substance of the protections afforded by ERISA.

Participant's Exercise of Control

Having concluded that Bank One failed to comply with the provisions of §

8.10, the district court's conclusion that Bank One is not responsible for the Plan

participant's exercise of control after December 31, 1987 cannot stand. ERISA

does provide an escape from liability for fiduciaries in certain instances where a

loss results from a participant's exercise of control:

> (c)(1)  In the case of a pension plan which provides for individual
> accounts and permits a participant . . . to exercise control over the
> assets in his account, if a participant . . . exercises control over the
> assets in his account (as determined under regulations of the
> Secretary)—
> . . .
> (B) no person who is otherwise a fiduciary shall be liable under
> this part for any loss, or by reason of any breach, which results
> from such participant's . . . exercise of control.

29 U.S.C. § 1104(c)(1)(B).[3]  As § 1104(c) is "akin to an exemption from or a

defense to ERISA's general rule," the burden establishing its protection should be

borne by the party seeking it.  See Meinhardt v. Unisys Corp. (In re Unisys Sav.

Plan Litig.), 74 F.3d 420, 446 (3d Cir. 1996) (citing Lowen v. Tower Asset

Mgmt., Inc., 829 F.2d 1209, 1215 (2d Cir. 1987)).  Bank One cannot meet this

---

[3]At the time the events underlying this appeal took place, proposed
regulations had been released.  See 52 Fed. Reg. 33508-1 (1987) (proposed
regulation 29 C.F.R. § 2550.404c-1).  Those proposed regulations were finalized
and adopted in 1992.  See 29 C.F.R. § 2550.404c-1.  Because the regulations were
only proposed at the time, we need not consider them.  See Green v. Barnes, 485
F.2d 242, 244 (10th Cir. 1973) (declining to consider proposed HEW regulations);
see also Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.), 74 F.3d 420,
444 n.21 (3d Cir. 1996) (declining to consider 29 C.F.R. § 2550.404c-1 in a case
involving events occurring before the regulation went into effect).

burden. Because Bank One failed to perform the requisite procedures for implementing participant-direction of investments, we fail to see how § 1104(c)'s requirement for a participant's "exercise of control" could be met. Certainly, the lack of the required Letter Agreement, which would have provided the participants with the knowledge of the risk involved in choosing Hedged as an investment, runs contrary to any conclusion that the participants had any meaningful control over their investment choices. If anything, plan participants made choices tainted by (1) Bank One's failure to investigate Hedged, a breach of fiduciary duty found by the district court and from which Bank One does not appeal, and (2) Bank One's non-compliance with § 8.10 which would have informed plan participants of their rights, responsibilities and liabilities vis-a-vis self-direction. Thus, given the participants' tainted choices, Bank One cannot use § 1104(c) to escape liability for any of the participant's post-December 31, 1987 investment directions.

Causal Link

Bank One has not challenged on appeal the district court's conclusion that it violated the prudent man standard of care of ERISA when it failed to adequately investigate Hedged. See 29 U.S.C. § 1104(a)(1)(B) (requiring a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man . . . would use). While this settles any question as

to its liability before January 1, 1988, we still must address the extent of its liability for the period after that date. The liability provision of ERISA, 29 U.S.C. § 1109(a), makes a fiduciary liable for "losses . . . *resulting from* each such breach" of its fiduciary duty. Id. § 1109(a) (emphasis added). The phrase "resulting from" indicates that there must be a showing of "some causal link between the alleged breach . . . and the loss plaintiff seeks to recover." Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998); Whitfield v. Lindemann, 853 F.2d 1298, 1304–05 (5th Cir. 1988); Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir. 1982) (noting that the language of § 1109(a) "clearly indicates that a causal connection is required between the breach of fiduciary duty and the losses incurred").

We conclude that this causal link is established by Bank One's failure to make "adequate provision for the continued prudent management of plan assets." Glaziers & Glassworkers Union Local No. 252 Annuity Fund, 93 F.3d 1171, 1183 (3d Cir. 1996). The breadth of the prudent man standard codified by Congress in § 1104(a)(1)(B) is unmistakable, and it can extend beyond a trustee's purported departure. See id. (citing II Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts, § 106 (4th ed. 1987)). Bank One's failure to investigate Hedged, its lack of compliance with the Plan documents, and its failure to show that it informed the Plan participants that it was discontinuing its monitoring of

the investments establish the requisite causal connection under § 1109. See id. at 1183–84; see also Pension Benefit Guar. Corp. v. Greene, 570 F. Supp. 1483, 1497 (W.D. Pa. 1983) (stating that a trustee must be held to be a fiduciary "absent a clear resignation, and a resignation is valid only when he has made adequate provision for continued prudent management of the plan assets"), aff'd 727 F.2d 1100 (3d Cir. 1984). We conclude that the intent of ERISA would be frustrated were we to provide protection to Bank One in its efforts to shed liability for handing a ticking time-bomb, *i.e.*, Hedged, to the Plan participants when Bank One has conceded that its own breach resulted in losses to the Plan before January 1, 1988—losses that can be linked directly to the losses incurred after that date.

Given our foregoing analysis and conclusions, we need not reach the Crosby Plaintiff's argument that the district court erred in determining that the Plan was amended to remove Bank One as trustee, or the argument that even if the Plan became participant-directed, Bank One continued to have an ongoing fiduciary duty to the Plan.

Allison Plaintiffs

Prior to trial, the district court entered an oral ruling granting Bank One's "Motion to Dismiss or in the Alternative for Partial Summary Judgment," upholding as a matter of law the validity of the Indemnity Agreement, set out in pertinent part, *supra*, contained in the Custodial Agreement and Authorization for

the IRAs. The district court held further that the provision's language was not valid as to willful and wanton negligence and intentional or willful misconduct, and so instructed the jury as to willful and wanton misconduct but refused to instruct on ordinary negligence. The district court also instructed the jury on Bank One's claim for breach of the Indemnity Agreement. The jury found that Bank One's actions did not constitute willful or wanton misconduct, and awarded Bank One one dollar from each of the Allison Plaintiffs for their breach of the Indemnity Agreement. On appeal, the Allison Plaintiffs assert: (1) the district court erred in its ruling regarding the Indemnity Agreement, and (2) the district court erred in not instructing the jury on the Allison Plaintiffs' theories of negligence and breach of fiduciary duty.

The court's oral ruling on the Indemnity Agreement does not specify whether it was fashioned as a grant of summary judgment or a motion to dismiss. The Allison Plaintiffs assert various disputed issues of fact that should have prevented a grant of summary judgment, including: (a) the Authorization form provides for purchase of units in "Hedged Investments Associates Limited Partnership Investment Fund," which, according to the Allison Plaintiffs, did not exist; (b) whether the Allison Plaintiffs had sole authority and discretion under the Custodial Agreement to select investments; (c) whether the Allison Plaintiffs had ever read the "partnership prospectus or offering circular" as specified in the

Authorization; (d) whether the Allison Plaintiffs met the suitability requirements for the investments made by Bank One; (e) what "Agreement" is referred to in the Authorization; and (f) what asset was purchased by the bank. Aplt. Br. at 32–33.

Under the terms of the Custodial Agreement, the law of the state of the Custodian's principal place of business determines the agreement's applicable law. Aplt. App. at 2258. Thus, Colorado law applies. Under Colorado law, courts are not permitted to look beyond the plain language of an unambiguous waiver and should look only to the terms of the waiver itself. See Anderson v. Eby, 998 F.2d 858, 862 (10th Cir. 1993) (citing Jones v. Dressel, 623 P.2d 370 (Colo. 1981)). We agree with the district court that the terms of the Indemnity Agreement are expressed in clear and unambiguous language. Thus, the Allison Plaintiffs' disputed issues of fact, which all relate to the terms in the underlying agreement and not to the Indemnity Agreement itself, are simply not material to the resolution of this issue. As such, we need only determine whether the district court applied the substantive law correctly. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

Under Colorado law, "[a]n exculpatory agreement, which attempts to insulate a party from liability from his own negligence, must be closely scrutinized." Jones v. Dressel, 623 P.2d 370, 376 (Colo. 1981). In determining the validity of such an agreement, Colorado courts consider four factors: (1) the

existence of a duty to the public, (2) the nature of the service performed, (3) whether the contract was fairly entered into, and (4) whether the intention of the parties is expressed in clear and unambiguous language. Id. As discussed *supra*, we have already concluded that the language of the Indemnity Agreement is clear and unambiguous, we thus need only consider the first three factors.

In Jones, the Supreme Court of Colorado considered whether an exculpatory agreement for a sky-diving company was valid. The court looked to a California Supreme Court case, Tunkl v. Regents of Univ. of Cal., 383 P.2d 441, 444–45 (Cal. 1963), for the factors to consider in determining whether a duty to the public existed:

> The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public . . . As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

Jones, 623 P.2d at 376–77 (quoting Tunkl, 383 P.2d at 444–45). In light of these factors, the Jones court concluded that no duty to the public existed because the contract at issue did not "fall within the category of agreements affecting the public interest." Jones, 623 P.2d at 377. The Allison Plaintiffs contend that a duty to the public exists here because banking is a regulated industry, Bank One offers its IRA services to any member of the public, the Allison Plaintiffs'

property was placed under Bank One's control, and Bank One possessed superior bargaining power. We disagree.

One of the more important factors in determining the existence of a duty to the public is the availability of choice in the market for the particular service. See Dean Witter Reynolds, Inc. v. Superior Court, 259 Cal. Rptr. 789, 795–97 (Cal. Ct. App. 1989). The existence of such a choice cuts against the very reason for holding an exculpatory provision invalid—that the weaker party lacks "any realistic opportunity to look elsewhere for a more favorable contract." Id. at 797. Indeed, the California Supreme Court distinguished Tunkl when it was presented with a case where the plaintiff was free to choose a different medical plan or make individual arrangements for medical care. Madden v. Kaiser Foundation Hosp., 552 P.2d 1178, 1186 (Cal. 1976). Construing this authority, the Dean Witter Reynolds court denied a plaintiff's claim that a financial institution's charges for an IRA were excessive when there were "reasonably available alternative sources of supply" of IRA providers. Dean Witter Reynolds, 259 Cal. Rptr. at 795. As the Dean Witter Reynolds court recognized, an individual can obtain IRA services at any one of hundreds of banks or other financial institutions. We conclude that such availability of services not only contradicts the Allison Plaintiffs' assertion that Bank One provided a duty to the public, but also prevents them from claiming that the Indemnity Agreement runs contrary to

the remaining two factors (nature of the service and whether the contract was fairly entered into) that Colorado courts consider in determining whether an exculpatory provision is invalid. See Jones, 623 P.2d at 376 (listing factors); see also Metz v. Indep. Trust Corp., 994 F.2d 395, 400 (7th Cir. 1993) (concluding that an exculpatory provision in an IRA agreement did not violate Illinois public policy). Consequently, we hold that the Indemnity Agreement was valid and the district court was correct in refusing to instruct the jury on ordinary negligence.

The Allison Plaintiffs' remaining argument is twofold. First, they assert that if we reverse the district court's summary judgment, then they are entitled to a new trial and the submission of the negligence issues to the jury. Given our conclusions *supra*, we necessarily reject this argument. The Allison Plaintiffs next assert that the district court should have instructed the jury on a breach of fiduciary duty claim arising not from the Custodial Agreement, but from the IRA Authorization form. We review the district court's decision to give or its refusal to give a particular jury instruction for abuse of discretion and consider the instructions as a whole *de novo* to determine whether they accurately informed the jury of the governing law. Garcia v. Wal-Mart Stores, Inc., 209 F.3d 1170, 1173 (10th Cir. 2000).

Because the Authorization form does not incorporate the Custodial Agreement, as did the Adoption Agreement, the Allison Plaintiffs appear to be

attempting an end-run around the effect of the indemnity and hold harmless provision in the Custodial Agreement. The Authorization form itself, however, contains its own indemnity and hold harmless provision: "4. I agree to indemnify and hold [BANK ONE] harmless . . . from any other claim which may be made by reason of this investment." Aplt. App. at 2324. For the reasons we discussed *supra*, this provision is no less valid than the one included in the Custodial Agreement. Further, the jury did receive an instruction on breach of fiduciary duty, and we consider it broad enough to have covered the Allison Plaintiffs' alleged missing instruction. See V Aplt. App. at 1764. The jury found no breach of fiduciary duty on the instruction actually given by the district court and found further that Bank One did not act in a willful and wanton manner in any respect. As such, we conclude the instructions, as a whole, accurately informed the jury of the governing law.

Bank One's Cross-Appeal

In its cross-appeal, Bank One raises three points of error on the part of the district court: (1) the district court erred in awarding pre-judgment interest to the Crosby Plaintiff at Colorado's statutory rate of 8 percent; (2) the district court erred when it failed to offset the judgment entered in favor of the Crosby Plaintiff with settlement amounts received from other parties; and (3) the district court erred in construing the "all expenses reasonably incurred" provision of the

Indemnity Agreement as not including attorney's fees. Before we address the merits of these assertions, however, we must address a jurisdictional argument raised by the Cross-Appellees in their response brief.

Bank One filed an Application for Costs and Attorney Fees with Supporting Authorities on October 12, 1999, upon which the district court has yet to rule. In addition, on November 30, 1999, Bank One filed a motion pursuant to Fed. R. Civ. P. 60 requesting the district court to recalculate prejudgment and moratory interest and reduce the award for certain settlements received by the Crosby Plaintiff. In other words, Bank One has filed separate motions addressing the exact issues it raises in this cross-appeal. The district court denied the Rule 60 motion and Bank One did not file a separate Notice of Appeal. The Cross-Appellees assert that an appeal of the district court's decision regarding attorney's fees is therefore premature, and argue further that Bank One's failure to file a Notice of Appeal of the district court's denial of the Rule 60 motion divests us of jurisdiction. We disagree.

While it is true that "[w]hen an intervening motion occurs which could alter the order or judgment appealed from, a new notice of appeal must be filed after disposition of the subsequent motion," Hinton v. City of Elwood, Kan., 997 F.2d 774, 778 (10th Cir. 1993), the Supreme Court has stated:

> In short, no interest pertinent to § 1291 is served by according different treatment to attorney's fees deemed part of the merits

recovery; and a significant interest is disserved.  The time of appealability, having jurisdictional consequences, should above all be clear.  We are not inclined to adopt a disposition that requires the merits or nonmerits status of each attorney's fee provision to be clearly established before the time to appeal can be clearly known.  Courts and litigants are best served by the bright-line rule, which accords with traditional understanding, that a decision on the merits is a "final decision" for purposes of § 1291 whether or not there remains for adjudication a request for attorney's fees attributable to the case.

Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202–03 (1988).  Thus, the fact that Bank One has a pending application before the district court regarding attorney's fees does not affect the finality of the decision on the merits.[4]  While we recognize that the issue regarding attorney's fees is central to the merits of this cross-appeal, we will not stray from the Supreme Court's clear mandate.

As to the district court's denial of Bank One's Rule 60 motion, we acknowledge that such a motion is separately appealable.  See Stouffer v. Reynolds, 168 F.3d 1155, 1172 (10th Cir. 1999).  Bank One, however, has styled its appeal as one addressing the district court's Combined Order and Judgment as opposed to an appeal of the denial of the Rule 60 motion.  "The modern view is that a pending appeal does not preclude a district court from entertaining a Rule

---

[4]In its opening brief in the appeal companioned with this case, Bank One notes that it filed a Bill of Costs and a supporting Application for Costs and Attorney Fees with Supporting Authorities.  Whether this application and the one noted above are one and the same is not clear.  Bank One does admit in its cross-reply brief that there is still an application pending before the district court.  In light of our disposition, we need not inquire any further.

60(b) motion." 12 Moore's Federal Practice 3d, § 60.67[2][b], at 60-207. We have stated that although a district court may lack "jurisdiction to *grant* the Rule 60(b)(2) motion due to the appeal . . . the court was free to consider the motion." Aldrich Enter., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991). It is entirely consistent with this general rule for us to consider Bank One's cross-appeal of the district court's final judgment despite the fact that the district court denied Bank One's Rule 60 motion addressing the same issues.

Moratory Interest

The award of prejudgment interest is considered proper in ERISA cases. See Lutheran Med. Ctr. v. Contractors Health Plan, 25 F.3d 616, 623 (8th Cir. 1994) (an award of prejudgment interest is necessary to allow an ERISA beneficiary to obtain appropriate equitable relief); Rivera v. Benefit Trust Life Ins. Co., 921 F.2d 692, 696 (7th Cir.1991). Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable. Overbrook Farmers Union v. Mo. Pac. RR., 21 F.3d 360, 366 (10th Cir. 1994). Bank One claims that the district court's award of 8 percent, pursuant to Colo. Rev. Stat. § 5-12-102(1), (2), was an abuse of discretion because it exceeded the average 52-week T-Bill rate of 6 percent. See 28 U.S.C. § 1961(a). We review a district court's award of prejudgment interest to an ERISA plaintiff for an abuse of discretion, Thorpe v. Retirement Plan of the Pillsbury Co., 80 F.3d 439, 445

-37-

(10th Cir. 1996).      ERISA provides that a participant may bring a cause of action to obtain "appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B). Construing this provision, the district court used the Colorado statutory interest rate to "assure that some earnings or profit is credited to [the Plan]." Aplt. App. at 1921 (Combined Order and Judgment at 12).

We have held squarely that punitive damages are not available in an ERISA action. Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 888 n.2 (10th Cir. 1988). "Although prejudgment interest is typically not punitive, an excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one . . . ." Ford v. Uniroyal Pension Plan, 154 F.3d 613, 618 (6th Cir. 1998). In Ford, the Sixth Circuit rejected the plaintiffs' argument that federal courts should adopt wholesale a state's statutory interest rate for ERISA prejudgment interest awards. Id. at 619. Bank One contends that we should follow this holding and reverse the district court's award of prejudgment interest of 8 percent.

While we may agree that simple incorporation of a state's statutory interest rate may violate the federal policy underlying ERISA, we do not think such a result attaches in this case. The Sixth Circuit stressed in Ford that federal courts "need not" incorporate state law, but reaffirmed its "earlier decisions leaving the

determination of the prejudgment interest rate within the sound discretion of the district court." Id. In Ford, significantly, the court noted that the Michigan legislature had prescribed the higher interest rate "not only to ensure that the plaintiff is fully compensated for the delay in receiving money damages, but also to 'compensate the prevailing party for litigation expenses.'" Id. at 618 (quoting Gordon Sel-Way, Inc. v. Spence Bros., Inc., 475 N.W.2d 704, 716 (Mich. 1991)). The Colorado statute at issue here, Colo. Rev. Stat. 5-12-102(1), (2), has not received such a construction. Thus, the concerns the Ford court faced are not present in the case before us. The district court was clear in its Order and Judgment that it was using the rate to restore lost earnings and profits to the Crosby Plaintiff, not to punish Bank One. Accordingly, we find that the district court did not abuse its discretion in awarding prejudgment interest at the Colorado statutory rate of 8 percent.

Offset of Settlements

Bank One claims that the district court should have offset the Crosby Plaintiff's damages award with settlement amounts it received from other parties. In its order denying Bank One's Rule 60 motion, the district court noted that these amounts were available during trial but were not presented by Bank One. Bank One claims that this evidentiary deficiency is due to the district court's prior ruling, during the jury trial, that there would be no testimony regarding settlement

by plaintiffs in previous cases. Bank One, however, fails to make a "precise reference in the record where the issue was raised and ruled on." 10th Cir. R. 28.2(C)(2). Further, Bank One fails to explain why it did not raise this issue in the damages hearing held before the district court on January 29, 1998. We have held consistently that issues raised but not pursued at trial cannot be the basis for an appeal. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 722 (10th Cir. 1993). Bank One has therefore either inadequately presented the argument to the district court, in which case it is waived, or has failed to include the appropriate portion of the record for review by this court, "in which case we leave the district court's determination undisturbed." Jetcraft Corp. v. Flight Safety Int'l, 16 F.3d 362, 366 (10th Cir. 1993).

Attorney's Fees

The Indemnity Agreement provided that Bank One could recover "all expenses reasonably incurred." The district court ruled that Bank One could not recover attorney's fees under this provision because Colorado law calls for "strict construction" of indemnity provisions, and as such, "expenses reasonably incurred" did not encompass attorney's fees. The issue is at bottom a question of contract interpretation, one which we review *de novo*. Ad Two, Inc. v. City and County of Denver, 9 P.3d 373, 376 (Colo. 2000).

Colorado courts adhere strictly to the "American Rule" of disallowing attorney's fees against a losing party in litigation. Bunnett v. Smallwood, 793 P.2d 157, 160 (Colo. 1990). "In our view, attorney fees and costs should not be awarded for breach of a release unless . . . the agreement expressly provides that remedy." Id. at 162. Therefore, "[i]n the absence of a plain, unambiguous agreement for the award of attorney fees and costs, we will not create such a remedy for the parties." Id. at 163. Our review of Colorado law and other authority leads us to the conclusion that the district court was correct in ruling that the Indemnity Agreement's "expenses reasonably incurred" language does not meet the Colorado Supreme Court's standard for awarding attorney's fees in this case.

Colorado's Rule of Civil Procedure 37, nearly identical to Fed. R. Civ. P. 37, allows Colorado courts to award as sanctions "reasonable expenses incurred . . . including attorney fees." Colo. R. Civ. P. 37(a)(4); see also id. 11(a) (allowing a court to impose as sanctions "reasonable expenses incurred . . . including a reasonable attorney's fee"). This phrasing suggests that attorney's fees are not an item immediately recognizable, under Colorado law, as a "reasonable expense." Indeed, "[t]he word 'expenses,' while it might include attorney's fees, is not very appropriate for that purpose. 'Generally it is held that attorney's fees are not included within a contractual provision for the payment of 'expenses.'"

Milwaukee Mechanics Ins. Co. v. Davis, 198 F.2d 441, 445 (5th Cir. 1952) (quoting 14 Am. Jur., Costs, § 63). These authorities convince us that if Bank One had intended to include attorney's fees as part of its recovery under the Indemnity Agreement, it should have stated so expressly. See Royal Discount Corp. v. Luxor Mot. Sales Corp., 170 N.Y.S.2d 382, 383 (N.Y. App. Term 1957) (where New York law required express language for recovery of attorney's fees pursuant to an assignment agreement, the terms "costs" and "expenses" did not include such).

Bank One cites various authorities to persuade us that the Indemnity Agreement covers attorney's fees, all of which we find distinguishable. In Atari Corp. v. Ernst & Whinney, 981 F.2d 1025 (9th Cir. 1992), the court concluded that a corporate officer's indemnity agreement containing the phrase "to the fullest extent permitted by applicable law" allowed for recovery of attorney's fees. Id. at 1032. The "applicable law" in that case, however, was Delaware's. In a case cited by the Atari court, the Supreme Court of Delaware noted that, under Delaware law, "a corporation may indemnify any person who was or is a party . . . to any threatened, pending or completed action . . . against expenses (including attorney's fees)." Hibbert v. Hollywood Park, Inc., 457 A.2d 339, 342 n.2 (Del. 1983) (quoting 8 Del. C. §145). Given that the underlying applicable

law in <u>Atari</u>, to its fullest extent, explicitly allowed recovery of attorney's fees, the court simply interpreted the provision within its own express terms.

Bank One also relies on <u>Nat'l Union Fire Ins. Co. v. Denver Brick & Pipe Co.</u>, 427 P.2d 861 (Colo. 1967), a case where the Colorado Supreme Court had to determine whether an agreement to indemnify for "all cost, damage, and expense by reason of the Principal's default . . . [and] for all outlays and expenditures . . . in making good such default" included attorney's fees. <u>Id.</u> at 863. The court ruled that attorney's fees were indeed included in the indemnity provision. <u>Id.</u> at 868. We do not consider our decision contrary to the conclusion of the court in <u>National Union</u>, however, because the language in that agreement was significantly broader and more inclusive than the term "expenses reasonably incurred." Further, the case was decided nearly twenty-five years before the Supreme Court of Colorado stated its "expressly provides" rule for the recovery of attorney's fees in <u>Bunnett</u>. The remaining cases cited by Bank One are distinguishable and lend no support to its argument. See <u>Allstate Ins. Co. v. Robins</u>, 597 P.2d 1052 (Colo. Ct. App. 1979) (recognizing exception to American rule where insurance contract provided for reimbursement of "all reasonable expenses . . . *incurred at insurer's request*) (emphasis added); <u>Mooney v. Van Kleeck Mortgage Co.</u>, 245 P. 348 (Colo. 1926) (ruling that attorney's fees for review of abstract of title as well as the $125 "cost" for taking the case to the

Colorado Supreme Court, were included in loan default reimbursement provision containing the language, "I agree to pay all expenses you . . . may have incurred"). We affirm the district court's ruling that attorney's fees were not explicitly provided for in the Indemnity Agreement as required under Colorado law.

*Appeal Nos. 01-1208, 01-1211, 01-1240*

Following the district court's entry of the Combined Order and Judgment on the ERISA claim, Bank One filed a Bill of Costs and a supporting Application for Costs and Attorney Fees with Supporting Authorities. Bank One sought costs of $112,913.82 based upon 28 U.S.C. § 1920, as well as the Indemnity Agreement. Apportioning its costs based upon the results of the various claims, Bank One sought recovery of seventeen categories of costs, some mentioned specifically in 28 U.S.C. § 1920 and others falling outside that section's ambit. After the appearance of all parties before the clerk, the clerk awarded Bank One costs of $1,361.40 in the Allison case and $397.07 in the Crosby case. The district court subsequently denied Bank One's Motion for Review and for Award of Additional Costs in its entirety. Bank One's appeal and the Crosby Plaintiff's cross-appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

In its motion before the district court, Bank One argued that it was entitled to additional costs in the Allison case under the Indemnity Agreement and that it

was entitled to additional costs in both cases pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920. The district court rejected both arguments. To the extent Bank One sought additional costs pursuant to the Indemnity Agreement, the district court ruled that because the jury had awarded damages of one dollar from each Allison Plaintiff based on the breach of that agreement, Bank One was in effect asking the district court to set aside the jury's verdict. Because Bank One had not filed the appropriate motion for setting aside the verdict, the district court refused to award additional costs based upon the Indemnity Agreement. As to the additional costs that Bank One sought under Rule 54(d)(1) and § 1920, the district court found generally that Bank One had failed to establish with supporting documentation that the additional costs it sought were necessary to the case.

Indemnity Agreement

Although we typically review a district court's award of costs under an abuse of discretion standard, Jones v. Unisys Corp., 54 F.3d 624, 633 (10th Cir. 1995), we review a contractual provision regarding award of such costs *de novo*. See Ad Two, 9 P.3d at 376; see also Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987) ("[A]bsent explicit statutory or *contractual* authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in [28 U.S.C. § 1920].") (emphasis added). Bank One asserts that the Indemnity Agreement's "expenses reasonably incurred" language

requires an award beyond just those costs authorized in § 1920. We agree with this proposition, as Colorado law, and general usage, suggest that the term "expenses" encompasses outlays beyond those "costs" listed in § 1920. See, e.g., Ferrell v. Glenwood Brokers, Inc., 848 P.2d 936, 940 (Colo. 1993) ("The list of expenses that may be awarded as costs under [Colo. Rev. Stat.] § 13-16-122, however, is illustrative and not exclusive."); 10 Moore's Federal Practice 3d, § 54-103[1], at 54-174 ("'[C]osts' is a term of art that refers only to those particular expenses that may be taxed to the opponent under 28 U.S.C. § 1920."). Our acquiescence to this argument, however, only takes Bank One so far because its failure to pursue the argument in the district court is fatal to its appeal on the matter.

In an oral ruling, the district court stated that if Bank One prevailed on the Indemnity Agreement claim, then the Allison Plaintiffs "would, of course, not recover and would be liable for expenses." II Aplt. App. (01-1208, 01-1211, 01-1240) at 584. Bank One claims that this ruling became the law of the case and, as a result, the district court could not "reverse" the ruling in the same case. Bank One's argument relies on cases that are relevant where a district court attempts to avoid a decision of a higher court in the same case, or perhaps where an appellate panel deviates from the decision of a prior panel. See, e.g., United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998) (reviewing exceptions in

determining whether to depart from a prior panel decision); United States v. Monsisvais, 946 F.2d 114, 115–16 (10th Cir. 1991) (discussing law of the case in terms of district court adherence to appellate decisions).  A lower court's ability to depart from its own prior decisions is discretionary.  See 18 Moore's Federal Practice 3d, § 134.21[1], at 134-46; see also Prisco v. A & D Carting Corp., 168 F.3d 593, 607 (2d Cir. 1999) (discussing the "second branch" of the law of the case doctrine implicated when a court reconsiders its own ruling "in the absence of an intervening ruling of a higher court").  Bank One's reliance on law of the case is misplaced even further because of one salient fact: the district court never reversed its prior ruling.  The district court's order rejecting Bank One's additional requested costs does not deny that Bank One was entitled to its "expenses reasonably incurred" beyond those costs enumerated in § 1920.  Instead, the district court's rationale was that any recovery Bank One could have possibly received beyond § 1920 was subsumed in the jury's award of one dollar from each Allison Plaintiff.  We agree with the district court.

In Ferrell, the Supreme Court of Colorado discussed extensively whether attorney's fees were more appropriately categorized as "costs" or as "damages." 848 P.2d at 941–42.  The court arrived at the decision that such a determination is, "by its very nature, a fact- and context-sensitive one, which rests within the sound discretion of the trial court."  Id. at 941.  The court then went on to hold

that where attorney's fees are "simply the consequence of a contractual agreement to shift fees to a prevailing party, then they should be treated as 'costs.'" Id. "In such a case, it is within the sound discretion of the trial court to defer consideration of the entitlement to such fees, and the amount of the fees, until the merits of the case are decided." Id. at 942 (internal citation omitted). Although the Ferrell court was discussing attorney's fees, we think the discussion is just as applicable to a contractual agreement regarding "expenses" incurred in litigation. Because the award of such expenses in the instant case was necessarily dependent upon whether the Allison Plaintiffs succeeded (or failed) in their effort to prove willful and wanton misconduct on the part of Bank One, the Indemnity Agreement more closely resembles a contractual agreement to shift fees to a prevailing party. Thus, under Colorado law, the district court's decision to put the award of "expenses reasonably incurred" to the jury was within its discretion.

The record reveals no instance where Bank One tendered a jury instruction regarding the computation of damages on its breach of the Indemnity Agreement counterclaim. The district court's oral ruling that Bank One would be entitled to expenses, the very ruling to which Bank One insists the district court should have adhered, should have served as notice that a damages instruction might be necessary. Alternatively, Bank One could have requested a separate hearing on damages, much like the one the district court held on the ERISA claim. Bank

One's own answer and counterclaim to the amended complaint states that "[Bank One] has been damaged by Allison's breach of contract, *an amount to be proven at trial, including, its costs and expens[es] in defending this action*, its increased overhead expenses, its loss of reputation in the community and its loss of business." IV Aplt. App. at 1406 (99-1465, -1466, -1487, -1490) (emphasis added). The fact that Bank One included this assertion in its counterclaim also belies its assertion that the district court's "reversal" was issued when "it was too late for Bank One to alter its strategy accordingly." Aplt. Br. at 17 (01-1208, -1211, -1240). We conclude that Bank One has waived any right to appeal this issue due to its failure to pursue the course of action in the district court. See Lyons, 994 F.2d at 722 (stating that issues raised but not pursued at trial cannot be the basis for an appeal).

§ 1920 Costs

Bank One also appeals the district court's denial of its Rule 54(d)(1) motion requesting additional costs for photocopying charges and deposition transcript charges. In its cross-appeal, the Crosby Plaintiff seeks additional recovery to the extent Bank One received additional recovery. Because we have reversed the district court's decision on the merits in the Crosby appeal, a question arises, subject to the district court's discretion, as to who is the "prevailing party" for purposes of Rule 54(d)(1). See Roberts v. Madigan, 921

F.2d 1047, 1058 (10th Cir. 1990) (holding that the district court did not abuse its discretion in awarding costs to the party that prevailed "on the vast majority of issues and on the issues truly contested at trial"); Howell Petroleum Corp. v. Samson Res. Co., 903 F.2d 778, 783 (10th Cir. 1990) (holding that the district court was within its discretion to refuse to award costs to a party which was only partially successful).  We therefore vacate the district court's decision, to the extent it relates to the Crosby case, as to the award of costs pursuant to Rule 54(d)(1) and 28 U.S.C. § 1920 and remand for further proceedings.

Because we have affirmed the district court's decision as to the merits in the Allison case, we address Bank One's appeal of the denial of its request for additional costs.  In doing so, we point out that the taxing of costs pursuant to Rule 54(d)(1) rests in the sound judicial discretion of the trial court, U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1245 (10th Cir. 1988), overruled on other grounds as recognized by Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1231 (10th Cir. 1996), and an abuse of that discretion occurs only where the trial court "bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling."  In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig., 669 F.2d 620, 623 (10th Cir. 1982).  The trial court's exercise of this discretionary power "turns on whether or not the costs are for materials necessarily obtained for use in the case."  U.S.

Indus., 854 F.2d at 1245. Further, the burden is on the party seeking costs, here, Bank One, to establish the amount of compensable costs and expenses to which it is entitled and assumes the risk of failing to meet that burden. Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1208 (10th Cir. 1986).

Bank One provided a voluminous amount of supporting documentation to establish that it incurred photocopying charges in relation to the litigation. The district court, however, concluded that Bank One had failed to establish through that supporting documentation or other itemization that the charges were reasonably necessary for trial. See Jones v. Unisys Corp., 54 F.3d 624, 633 (10th Cir. 1995) (finding no abuse of discretion where district court "apparently" found certain photocopying charges were not reasonably necessary for trial). Bank One claims that it provided adequate documentation to establish such necessity and that in a case of this magnitude, any further detail would be nearly impossible to provide. While we understand that a complex case such as this burdens litigants with heavy administrative responsibilities, we see no reason to make an exception to the general rule that a party seeking costs must establish their necessity for trial. Our review leads us to the conclusion that the district court did not abuse its discretion in rejecting Bank One's request for additional costs from the Allison Plaintiffs related to photocopying charges.

Bank One also challenges the district court's denial of its request for additional costs related to transcripts of depositions. The district court rejected the request on two grounds: (1) Bank One's itemization did not provide any indication as to the relationship of the individual expenditures and whether they were reasonably necessary for trial; and (2) the expenditures were incurred from 1992 to early 1995, well before the 1997 trial. We cannot affirm the district court on this second ground because we do not view this as an adequate reason for denying such costs. As long as the taking of the deposition appeared to be reasonably necessary at the time it was taken, barring other appropriate reasons for denial, the taxing of such costs should be approved. Callicrate v. Farmland Indus., Inc., 139 F.3d 1336, 1340 (10th Cir. 1998).

Be that as it may, the district court's primary ground for denying Bank One's request was that Bank One provided insufficient support and failed to provide an adequate explanation for the necessity of the requested costs. The court exercises its discretionary power to determine whether materials are necessarily obtained for use in a case "based on either the existing record or the record supplemented by additional proof." U.S. Indus., 854 F.2d at 1245. Bank One contends that it provided an adequate list of deposition transcript charges for individuals identified by the parties as possible witnesses at trial. While a number of courts have allowed such costs where the deposition related to a

potential witness, see, e.g., Rodriguez v. Zavaras, 22 F. Supp. 2d 1196, 1204 (D. Colo. 1998); Echostar Satellite Corp. v. Advanced Comm. Corp., 902 F. Supp. 213, 216 (D. Colo. 1995), we do not find an abuse of discretion in the district court's conclusion that Bank One's justifications and record references were inadequate to support its claim of reasonable necessity. Accordingly, we affirm the district court's denial of deposition transcript charges as costs against the Allison Plaintiffs.

As to Appeal No. 99-1465, the Allison Plaintiffs, we AFFIRM the district court in all respects. As to Appeal No. 99-1466, the Crosby Plaintiff, we REVERSE the decision of the district court and REMAND for proceedings consistent with this opinion. As to Appeal Nos. 99-1487 and 99-1490, Bank One's cross-appeals, we AFFIRM the district court in all respects. As to Appeal Nos. 01-1208, 01-1211, and 01-1240, we AFFIRM the district court in part but VACATE the judgment and REMAND for further proceedings consistent with this opinion.

No. 99-1465, etc. - <u>Allison v. Bank One - Denver</u>

**HARTZ**, Circuit Judge, dissenting in part:

I concur in all of Judge Kelly's impressive opinion except for the section entitled "Purported Amendment of Plan." I would affirm the district court's decision that the Plan was amended to provide for self-direction of investments by the participants. Nevertheless, even if the Plan was amended, Bank One may be subject to liability for losses arising from the self-directed investments in Hedged. Therefore, I agree with the majority that reversal is necessary.

As I understand the majority opinion, its view of events is that (1) each participant in the Plan wanted to self-direct the investments in the participant's individual account, but (2) none of the participants executed the self-direction documents required by § 8.10 of the Plan, so (3) the desires of the participants had no legal effect, and (4) Bank One continued to have full responsibility for all Plan investments after December 31, 1987.

I respectfully disagree. I understand the district court's findings to say (although I would have no objection to a remand for clarification on the matter) that everyone, including at least a majority of the participants, wanted to change the Plan itself. Under the change the Trustee no longer would control the investments but, rather, each participant would direct the investments for the participant's individual account. Because the Plan as a whole was being changed, there was no

need for individual participants to follow the procedures of § 8.10 to carry into effect a desire for self-direction. Indeed, a participant would no longer have the option of choosing between self-direction or Trustee-direction of investments. After the change, all participants had to self-direct because the Trustee would no longer manage investments.

Even under this version of events, Bank One does not necessarily prevail on the liability issue. To escape liability it would still need to establish affirmative answers to the following questions: (1) Was the change to the Plan properly authorized? (2) Was the change properly documented? (3) Did the change sufficiently satisfy 29 U.S.C. § 1104(c)(i) to protect Bank One from liability under ERISA with respect to post-change investments of Plan assets? In my view, affirmative answers to (1) and (2) were established, but I would remand to the district court to answer the third question.

Returning to my disagreement with the majority opinion, I believe that the issue dividing us is an issue of fact rather than law. The opinions in Dooley v. American Airlines, Inc., 797 F.2d 1447 (7th Cir. 1986), Stewart v. National Shopmen Pension Fund, 730 F.2d 1552 (D.C. Cir. 1984), and their progeny are of no assistance in the matter. In each case the court held that a change in benefits was permissible under the terms of the plan. Therefore, the change did not need to meet statutory requirements for plan amendments or obtain the approval necessary

for plan amendments. I do not read those decisions as holding that a plan <u>cannot</u> be amended when the ultimate result could be achieved without an amendment. Nor am I aware of any other authority for such a peculiar proposition.

To determine what actually happened, one must consider the context. The context here lends substantial support to the district court's finding that the Plan was amended. In 1987 Bank One, the Plan Trustee, decided to discontinue managing assets for trust department customers because its sole trust investment manager left the bank. Accordingly, Bank One informed the Plan that the Plan would need to choose between obtaining a new Trustee or converting to a participant-directed plan. The issue was not whether to permit each Plan participant to self-direct the investments in the participant's account. Section 8.10 of the Plan already permitted a participant to do that. The issue was whether to change the nature of the Plan by completely substituting self-directed investing for Trustee investing. The Plan Advisory Committee (composed of three of the Plan's five participants), reflecting the desire of the participants, voted for self-direction. (It would make no sense for the Committee to vote to allow Plan participants to elect self-direction of investments under § 8.10, because the only approval a participant needed under § 8.10 was approval of the Trustee.) After the change, no participant retained the option to have Bank One continue managing the investments.

I acknowledge that the record is not without ambiguity regarding what happened. A rational fact finder might decide that the Advisory Committee was merely advising the Plan participants that each could go ahead and self-direct investments. (Even then, however, one would need to consider the possibility that the Plan was amended to eliminate the specific requirements of § 8.10.) But the rational fact finder with responsibility in this case–the district court–found otherwise. We should defer to the district court's findings if they were not clearly erroneous. See Tosco Corp. v. Koch Ind., Inc., 216 F.3d 886, 892 (10th Cir. 2000).

I now turn to the questions whether the Plan amendment was properly authorized and whether it was properly documented. Section 14.02 of the Plan gives the Employer the right to amend the Plan, although any change that "affects the rights, duties, or responsibilities of the Trustee, the Plan Administrator or the Advisory Committee" requires the written consent of the affected person. This provision complies with the ERISA requirement that a plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3); see Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73 (1995).

The Crosby Plaintiff contends that the amendment was not properly approved. In particular, it complains of the absence of a corporate resolution by The Crosby Group, Inc. But Colorado corporate law is realistic about what is

required. "As to closely held corporations, in particular, action taken informally can be valid even though corporate formalities are not followed. Thus, corporations with few shareholders, and in which directors personally and directly conduct the business, act with little formality." White v. Thatcher Fin. Group, Inc., 940 P.2d 1034, 1037 (Colo. Ct. App. 1996). Here, Roger K. Crosby was the owner and sole director, as well as president, of The Crosby Group, Inc. His approval would constitute approval by the Employer. There is no dispute that he wished the Plan to become self-directed (he signed the Advisory Committee resolution regarding self-direction); and in any event, his subsequent conduct certainly ratified the change. See Curtiss-Wright, 514 U.S. at 85 (noting that even if amendment was not properly authorized at the outset, it could still be ratified).

This brings me to the most troubling issue--whether the amendment was properly documented. ERISA requires that a plan "be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). (The Plan itself requires that any amendment be in writing, but there is no need to consider this requirement separately.) The instrument, however, need not be a single document. See Rinard v. Eastern Co., 978 F.2d 265, 268 n.2 (6th Cir. 1992).

In my view, the following document satisfies the requirements of ERISA:

MEMORANDUM

TO:        Profit Sharing Plan Participants

FROM:      Advisory Committee

RE:        Self direction

DATE:      December 29, 1987

In order to allow participants to direct their portion of the profit sharing plan, the Administrative Committee has established participant direction of investments with the following guidelines:

- Directions will be made semi-annually:  January 1st and July 1st.
An election form will be distributed to each participant three weeks prior to the direction date (see attached) and must be returned to Louise one week prior to the direction date.  For this first time, given the shortness of time, please return ASAP.

- There are six options for investment; a minimum of 25% must be invested in any one option.  The options are:

> Income fund (bank's bond fund)
> Equity fund (bank's stock fund)
> Hedged account
> Certificates of Deposit
> > 6 month, 1 year or 2 year

- Both vested and non-vested portions of a participant's account are to be self-directed as a whole.

- Accounting fees to be paid by The Crosby Group, Inc.

- The Advisory Committee will provide each participant with the most currently available earnings information about the six options at the time the election forms are distributed.

Although the document does not bear the title "Amendment," "there is no requirement that documents claimed to collectively form the employee benefit plan be formally labelled as such," Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F.2d 125, 127 (9th Cir. 1991), nor is there a requirement that an amendment be so titled, see id. (corporate resolution was a plan amendment); cf. Normann v. Amphenol Corp., 956 F. Supp. 158, 162-63 (N.D.N.Y. 1997) (corporate resolution to amend plan constituted a plan amendment).

I recognize that the document is not a model of clarity. For example, the first sentence speaks of "allow[ing]" participants to self-direct, but the sentence goes on to say that the committee "has established" self-direction, and the remainder of the memorandum sounds mandatory. (Also, the word "allow" may simply reflect the participants' desire to have a self-directed plan rather than to switch trustees.) Nothing in ERISA, however, requires an amendment to be unambiguous in order to be effective. Issues of ambiguity can be resolved as a matter of trust interpretation. Here, all parties understood that the five participants were to self-direct their investments from then on, and they acted accordingly.[1]

One could argue that the December 29, 1987, memorandum is too "informal" to be part of the Plan. Miller v. Coastal Corp., 978 F.2d 622, 625 (10th Cir. 1992),

---

[1] The majority opinion notes the requirement of Plan § 14.02 that a Plan amendment must state an effective date. The Crosby Plaintiff's briefs do not complain about a violation of that requirement. The natural reading of the document is that self-direction was to begin immediately, and everyone acted as if that were the case.

-7-

states "that there is no liability under ERISA for purported informal written modifications to an employee benefit plan." But Miller does not define "informal," and the term must be understood in the context of the case. The plaintiff had sued to obtain the benefits set forth in annual statements sent him that calculated his retirement benefits. He acknowledged that the plan itself did not provide the benefits he sought. In rejecting his claim, this court noted that granting him the requested relief would negatively impact other participants.

> "'[E]mployees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.' [Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir. 1986)] These same concerns are implicated when, as here, a plan participant tries to enforce an informal written agreement under a theory of federal common law estoppel."

Miller, 978 F.2d at 625. The documents referred to as "informal" in Miller were documents relating to only one of many participants and thus could hardly be said to constitute part of the plan. I do not read Miller as requiring that we reject the memorandum directed to all participants as a Plan amendment. If the purpose of "formality" is to ensure that participants in a plan are properly informed of the terms of the plan, then there should be no concern here. The participants undoubtedly knew that henceforth they were to self-direct the investments in their individual accounts.

Moreover, no public policy is violated by allowing the amendment. Self-direction of investments may well be beneficial to participants. The language in Plan § 8.10 that exculpates the Trustee from certain liabilities after self-direction would seem to be designed to protect the Trustee, not the participants. Likewise, the form letter mentioned in the majority opinion (which the Plan did not require anyone to use) protects the Trustee with the language absolving the Trustee of liability. I agree that to the extent that including the exculpatory language in either § 8.10 or a form letter notified a participant of rights (or lack of them) that accrued upon self-direction, the language serves a purpose. One might contend that the exculpatory language merely informed participants of a release from liability provided by ERISA. In that regard, the exculpatory language in § 8.10 is virtually identical to that in 29 U.S.C. § 1104(c)(1)(B), which provides protection to fiduciaries with respect to a self-directed account "as determined under regulations of the Secretary [of Labor]." But to the extent that the Plan did not qualify under § 1104(c)(1)(B), which may well be the case, see In re Unisys Sav. Plan Litig., 74 F.3d 420, 443-48 (3d Cir. 1996), the exculpatory language would be misleading.

In fact, public policy would seem to favor recognizing the amendment. Everyone understood what was happening. In its brief in chief the Crosby Plaintiff speaks of "what the parties sought to accomplish--participant direction." Small businesses like The Crosby Group have enough technical hoops to jump through in

conducting their affairs without the imposition of an additional formality--in this case a document labeled "Plan Amendment" signed by all necessary parties. There is no reason to stretch the law to impose such a technical requirement. Cf. Mertens v. Hewitt Assoc., 508 U.S. 248, 262-63 (1993) (in denying cause of action to participants, Court recognizes ERISA's "'subsidiary goal of containing pension costs'"(quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 515 (1981)).

In short, I would affirm the district court's ruling that the Plan was amended to provide that henceforth each participant would direct the investment of assets in the participant's individual account. The record clearly supports a determination that (1) as of January 1, 1988, the Plan operated in that fashion; (2) all persons who needed to authorize a change (amendment) to the Plan gave such authorization for self-direction; (3) the document describing the new self-direction of the Plan satisfied the writing requirement of ERISA; and (4) requiring a more "formal" amendment, such as a document labeled "Plan Amendment" and signed by those with authority to amend, would have afforded no additional protection to the interests of the Plan participants.

Unfortunately for Bank One, however, recognizing that the Plan was amended does not necessarily shield it from liability for losses from the self-directed investments in Hedged. No Plan amendment removed Bank One as Trustee of the Plan. As Trustee, Bank One still owed various fiduciary duties to

the participants. I need not set forth all duties that might apply here. One will suffice. When Bank One provided Plan participants with a set of investments to choose from for their individual accounts, it had a duty to disclose material adverse information it possessed regarding any particular investment. See In re Unisys Sav. Plan Litig., 74 F.3d at 440-43. Here, the bank failed to disclose a critical piece of information--that Hedged had not been audited. As noted in the majority opinion, an audit would have disclosed fraud. I would remand for further proceedings regarding whether the Crosby Plaintiff can establish any losses arising from breach of fiduciary duty by Bank One after investments became self-directed and whether Bank One is entitled to escape liability under 29 U.S.C. § 1104(c)(1).